[Crim. No. 2677. First Dist., Div. One. Mar. 1, 1951.]

THE PEOPLE, Respondent, v. LESLIE DOANE CRAIN, Appellant.

Alfred J. Hennessy for Appellant.

Fred N. Howser, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

WOOD (Fred B.), J.—Defendant Crain appeals from the judgment rendered upon a verdict of conviction (1) of an attempt to commit abortion, a violation of sections 664 and 274 of the Penal Code, and (2) of conspiracy to commit abortion, a violation of sections 182 and 274 of that code. He also appeals from the order denying his motion for new trial. Defendant Farrell, tried and convicted of the same offenses with Crain, did not appeal.

Appellant predicates his plea for reversal of the judgment as to each count upon asserted insufficiency of the evidence to support the verdict and upon asserted prejudicial errors of law occurring at the trial.

The first count charged that on or about October 27, 1949, the defendants did willfully, unlawfully and feloniously "attempt to provide, supply, use and employ an instrument and other means upon the person of Dorothy Arriola, a woman, with the willful, unlawful and felonious intent then and

there and thereby to procure the miscarriage of the said Dorothy Arriola,'' said use and employment not being necessary to preserve her life.

This is a charge that defendants violated certain of the provisions of sections 274 and 664 of the Penal Code. Section 274 declares that ''Every person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the state prison not less than two nor more than five years.'' Section 664 declares that ''Every person who attempts to commit any crime, but fails, or is prevented or intercepted in the perpetration thereof, is punishable, where no provision is made by law for the punishment of such attempts, as follows: . . .''

The gist of this charge, therefore, is that defendants attempted to ''use and employ an instrument and other means,'' with the ''intent thereby to procure the miscarriage of'' the woman mentioned. ■ It is not necessary to charge or prove that the woman was pregnant. That requirement was amended out of section 274 in 1935.

As to the evidence, appellant claims it is insufficient to prove that appellant attempted to use or employ an instrument or other means ''with intent thereby to procure the miscarriage of such woman.'' He predicates this claim upon the asserted lack of evidence corroborating the testimony of that woman. In this he invokes section 1108 of the Penal Code, which states that ''Upon a trial for procuring or attempting to procure an abortion . . . the defendant cannot be convicted upon the testimony of the woman upon . . . whom the offense was committed, unless she is corroborated by other evidence.''

■ Appellant is correct in representing that in this particular case the sufficiency of evidence of the requisite intent does depend upon the sufficiency of such corroboration. The evidence concerning that intent came in directly and principally through the testimony of the prosecutrix, Arriola, and the appellant.

A good deal of Arriola's testimony went in under restrictions which rendered that portion of her testimony inapplicable to the appellant. That portion consisted of conversations she had with defendant Farrell outside the presence of appellant,

and went in subject to the limitation that it was hearsay as to appellant and not binding upon him. And when Officer Nelder started to testify concerning a conversation he had with Farrell outside the presence of appellant, the court, at the request of appellant, advised the jury, in these words: "Ladies and gentlemen, when any conversation is had with one defendant outside the presence of the other, the conversation is not binding on the other defendant. It's only binding on the defendant that speaks."

It appears that on the 27th of October, 1949, Arriola, a policewoman, went to the drugstore where Farrell, a pharmacist, was employed, and engaged in a conversation with him about 4 p.m. of that day. Between 6 p.m. and about 9 p.m. of that day she had four telephonic conversations with him, and took a room at a certain hotel.

*Testimony of Farrell.* Farrell testified that about 5 p.m. of that day he dropped in and saw Crain, who lived in the same building as did Farrell, and asked Crain if he could examine a patient that evening. Crain said that he was moving but thought he could do so. Crain asked about the patient. Farrell told him the patient was a woman and she seemed— she didn't know herself what the trouble was—that she was suffering from suppressed menstruation. He later went to see Crain about 9 o'clock that evening and told Crain that the woman had telephoned Farrell and told him she was at the hotel. He gave Crain a slip of paper with the name "Dorothy Ormond" on it.

*Testimony of Crain.* Crain was a graduate of the College of Osteopathic Physicians and Surgeons and held a Physician and Surgeon certificate issued to him by the State Board of Osteopathic Examiners authorizing him to use any and all methods in the treatment of diseases, injuries, deformities or other physical or mental conditions of human beings. Crain was a general practitioner; he had been a specialist in proctology. Crain testified that he was acquainted with Farrell, that their apartments were in the same building; that on October 27 he had a conversation with Farrell, who told him a woman had come in to see him and she wanted to see a doctor and had asked if he could see her that evening. Crain said that he was going across the bay and would be back sometime in the evening. Crain asked what kind of a case it was and Farrell replied it was a woman. Crain did not ask anything further as to what her ailments were. Farrell

told him it was a pelvic case, some mixed up menstruation, that she was nervous and sick, and Farrell asked if Crain could examine her. When Crain returned to San Francisco Farrell told him where to go. He went to the 16th Street Hotel that evening and arrived a few minutes before 10 o'clock. When he arrived at the hotel he knocked on the door of the room and a woman asked, "Who is it?" He replied, "Dr. Crain." She opened the door very suddenly and he went in. He asked if she were Mrs. Ormond and she replied that she was. He told her that someone told him she wanted to see him. She replied that she had been waiting. He asked her troubles and she replied that she did not feel well and had not menstruated. He asked if she could be pregnant. She said she thought that was her trouble. He replied that he hadn't much time, but could find out in two or three minutes if she were pregnant. To determine her pregnancy he was going to make a bi-manual examination. When in Woodacre he had taken out his gynecological instruments from a footlocker in which they were stored. He described to the jury the examination for pregnancy and explained the use of those instruments. He testified that the catheter was used as a test for pregnancy because it is almost impossible to insert a soft catheter into a nonpregnant uterus; if the woman is pregnant the catheter will enter easily. The instruments he had with him were the usual instruments carried by a doctor who was to examine a woman for menstrual trouble. He said he had no discussion with Arriola regarding a fee. Arriola was curious about the instruments. She asked what a curette was. He pulled one out and showed it to her. He prepared to make the examination, taking instruments out of his brief case and arranging them and putting a spread upon the bed, and asked her if she was ready for the examination. She replied that she had to go to the toilet. She left the room and was gone less than a minute when she returned. She had her purse under her arm and handed him some money. He was astonished because he had not asked for any money. He did not expect a fee, he thought he was doing a favor. At this time a sharp rap came on the door. Arriola opened the door and Officers Nelder and Vandervort came in. Crain said he could not hand the money back to Arriola because she had moved. He could either have dropped it on the floor or put it in his pocket. He put it in his pocket. He was in the room probably a little more than 10 minutes before the officers came in.

*Testimony of Arriola.* Arriola, a resident of San Francisco, testified that she was in the hotel room, waiting for a doctor to call. A knock came on the door. She asked, "Who is it?" A voice said, "It's your friend." She opened the door and Crain was there. He was holding a brief case and a large brown paper bag. The bag had a long white pan inside of it. Crain said he had had a fall in the country and had been knocked unconscious. He had gotten the call from Farrell after regaining consciousness. He said that the fall had made him very forgetful; that he had left his bag in another hotel on the third or first floor, he could not remember which. Arriola said she hoped he would not forget where he left her, and asked if he was going to come back and care for her. He said it probably would not be necessary, but if it should be, she could call Farrell and he would come over again. He said he was going to see a doctor about the fall. She asked him about the room, if it was adequate. He said it was not very good, the walls were thin and she could not scream all she wanted to. Crain took the pan out of the bag and put it on the table. Then he opened the brief case and took certain surgical instruments out, a vaginal speculum, and a tenaculum, and he took out a rubber tube which he called a catheter, and a line, and a tube of what he said was sulphathiazole. He said he would not be able to perform the operation which she expected he would, because he was in a hurry. She said she hadn't expected any particular operation, that she was just given to understand that something would be done which would produce a miscarriage. He said that normally he used a curette, and took an instrument from his bag which had a little hook on the end of it, and said that was a curette. He said that took 45 minutes, possibly an hour, and he wouldn't have time enough for that, that he would use a catheter. He tied some string to the catheter. He said he normally used nylon string which was very strong, but it dropped from his pocket when he suffered the fall, so he said this string was fish line and he had boiled it 30 minutes so it was very clean. He said he would squeeze some sulphathiazole into the end of the catheter, which he did, and would make it antiseptic, and that he would insert the catheter into the cervix and that it would curl up within the cervix and the fish line would be left exposed externally, and that she should from time to time pull on the fish line, and that she would be unable to remove it until such time as an abortion would be produced. She asked how long that

usually took. He said sometimes as little as 8 hours, sometimes as many as 24, and in some cases it's not successful at all. So she asked him whether this would be very painful, if there was anything he could do to alleviate pain. He said, yes, it would produce severe cramps but that she could probably take care of herself. He said that if the pain became unbearable the next day she could call Farrell and he could get in touch with Crain and he would come over and give her a shot of morphine. She said, ''Well, what about my meals? Will I be able to get up and get my meals?'' He said, ''You won't feel like eating.'' Crain was trembling a great deal. She asked him if he felt capable of performing the operation since he had the concussion. He said, ''Oh, yes,'' he was sure it would be all right. She asked whether he thought it was a safe operation and he said, ''Oh, yes,'' it was just as much to his interest for it to be safe as it was hers. She asked whether he felt he had performed the operation sufficiently enough so that there would be no danger, and he said, ''More than I would care to admit,'' or words to that effect. She asked him if he were a doctor. He said, yes, he was. He placed a large plastic sheet over the corner of the bed. He unfolded it and laid it over the edge of the bed. He had a light extension, with a small lighter band on it, and connected it to the socket that was in the ceiling. She asked how he was going to sterilize the instruments. He said he had some Lysol and would sterilize the instruments with that, and would use the Lysol internally as well. He also said he would use sterile gauze internally. She took some money with her into that room—$300 which she had gotten from Inspectors Nelder and Vandervort. She took the money out of her purse and threw it on the bed. It was actually $295. Crain picked it up and said he was in a big hurry, so wouldn't take the time to count it; put it in his left pocket. Crain went over to the washstand, ran some water in the pan, went over to the nightstand, and was putting the sulphathiazole in the catheter. A knock came on the door and she opened it to Inspectors Vandervort and Nelder. They entered.

Upon cross-examination, Arriola said she was not pregnant; she was not asking anyone to abort her; she was carrying out police orders; she had no arrangements to perform an abortion when she went to the hotel. She said Crain never asked her to undress; he was not going to do these activities; she was not going to let him touch her body. There was no agree-

ment about $300; she had no arrangement with Crain about $300, no agreement to give him $300, no agreement whatever with him. She did not know Crain, had never seen him or conversed with him before he came into that room. During her conversation with Crain she did say she would like to leave to go to the ladies' room but did not do so, he was ready to perform. She had arrangements with the police officers that they were to come to the room where she was within 8 or 10 minutes after the doctor's arrival; she was to converse with the doctor for 10 minutes; then the officers were to come and knock on the door and she was to open the door, which she did.

*The corroborative evidence.* Certain exhibits were introduced in evidence and certain testimony was given as tending to corroborate the testimony of Arriola.

The exhibits included a brief case, a paper bag (which had contained a pan), a number of surgical instruments, a rubber catheter with a string attached, and a light and extension cord, which the officers found in the hotel room where the conversation between Arriola and appellant took place; also a slip of paper and an envelope, which they found upon the person of appellant. The slip of paper bore the words and figures "Dorothy Ormand Room 211, 16th Street Hotel." The envelope bore the name and address of defendant Farrell and had written upon it, "Opal Jackson, 16th Street Hotel Room 211," and a telephone number.

The keeper of the hotel testified that in October he registered a person by the name of Opal Jackson; that on the 21st she rented a room for a week and checked out on the 23d; room 211, the room which Arriola rented on the 27th of that month, under the name Dorothy Norman, registering from Corte Madera.

A physician and surgeon, testifying on behalf of the respondent, explained the uses to which Crain's instruments were severally adapted, some for operations and some for examination of a patient, and testified that some of them any doctor would have, and some were particularly used for the practice of gynecology, which he described as treatment of the diseases of women, adding that all of the instruments could be used for the purpose of examination of a patient; that a doctor would have to have a curette to be fully equipped to carry on his profession properly, also a vaginal speculum; that a doctor would not be fully equipped to carry on his profession, if he treats women, unless he had the instruments

which the witness saw before him; that the catheter in evidence was a soft catheter; that it is not accepted procedure to perform an abortion with a soft catheter but it can be done. He further testified that it would be difficult to put a catheter through the cervix of a nonpregnant woman, and the attempt to do so might serve as a test for pregnancy; he had never used that particular test but he would not say that that method would not serve as a test. He stated that during pregnancy the cervix is usually slightly enlarged and softer and tends to take on a change of color, and that the doctor would use the vaginal speculum and the lamp to observe such changes, or the lack thereof, and if he observed such changes he would suspect that the woman was pregnant; also that the introduction of a soft catheter, if it entered, might be confirmatory evidence of pregnancy. He again stated that all of the instruments in evidence and the head-lamp are standard instruments which any doctor who might examine and treat women might have on his shelves.

Inspector Nelder testified that about 8:40 p. m. of October 27, 1949, he saw Arriola enter the 16th Street Hotel. About 15 minutes later she came out, and a little later she reentered the hotel. About 9:30 p. m. he observed a gentleman, carrying a black valise or brief case and a brown bag resembling the paper bag in evidence, enter the hotel. Nelder and Inspector Vandervort entered the hotel about five minutes later, went upstairs to the second floor, to room 211, where they stood outside of the room and listened. Nelder was able to hear a man's voice and a woman's voice, although he could not distinguish what they were saying. He heard a clanging sound, such as metal against metal, and a water faucet go on and off; that is all he heard. He knocked at the door and Arriola opened it, and the two officers entered. When they entered, Arriola was sitting in a chair to the right of the door and at the foot of a bed. Appellant was standing between the bed and the wall, near a small table. He was merely standing there, he looking at Nelder and Nelder at him. The brief case was on top of the bureau, unstrapped, and contained the miscellaneous items which it now contains. This paper bag was on top of the bureau near the brief case. The rubber catheter was on the small table; it had the string attached to it as it is now. The pan, including five instruments and a tube, were also on the table in the room. The plastic mat was spread out on the bed. The light and cord were attached to a socket and the light was burning when he entered the room.

Upon entering the room Nelder had a conversation with appellant. He asked him where the money was that he received for the abortion that he was to perform and he said, "I didn't receive any money." Nelder said, "Yes, you did, where is it?" "All right then," he said, "it is in my left rear pocket." Nelder removed $295 currency from appellant's left rear pocket, and said he would have to check the serial numbers against the numbers on a piece of paper he had. Appellant and Nelder sat down on the bed and checked those numbers. Nelder searched the person of appellant. Nelder took from Crain's person at that time the slip of paper with the name "Dorothy Ormond" on it, and the envelope addressed to Farrell. Nelder asked appellant how long he had been doing abortions in San Francisco. He remained silent; he did not answer. Then Nelder asked him how he was going to perform this abortion, and he remained silent. Nelder repeated the question, asking how he was going to perform this abortion, and appellant said he was not going to commit an abortion; said he was going to "commit an examination." Nelder pointed to the catheter and said, "Well, you weren't going to use this to do an examination, were you?" and he did not answer. Then Nelder said, "You don't charge $295.00 for an examination, do you?" and he said, "Well, I'm not going to answer any more questions," saying "I want an attorney." Nelder asked him if he was reluctant to talk about it and he said he would rather not talk about it. Nelder asked him where he had gotten the slip of paper and he said, "Oh, some poor fellow, some crackpot gave it to me." Nelder said, "Isn't it a fact that Bill Farrell gave you this?" and he replied, "No, Bill Farrell did not give it to me." Nelder asked him what time he got the piece of paper and he said, "Around 8:00 o'clock"; then Nelder said he couldn't have gotten it around 8:00 because Arriola did not get this room until 8:40 or 8:45. Appellant sat a while and he said, "Oh, it must have been a little after 9:00 o'clock." Asked if he knew Bill Farrell, appellant said he did. Asked if all of those instruments belonged to him, appellant said they did. The officers, Crain, and Arriola then went to Farrell's apartment, Nelder and Arriola in one car, Vandervort and appellant in another. Nelder had a conversation with Farrell before appellant arrived. As these four and Farrell were leaving, Nelder said to appellant, "Do you know Bill Farrell?" He said he did. Nelder said, "Is this Bill Farrell?" He said, "Yes, it is."

On cross-examination, Nelder testified that he arrived in front of the door of room 211 at 9:46, and stood there seven or eight minutes. When he entered the room he rushed up to appellant and said, "Where is the money you received for an abortion you were going to perform?" Up to that time he had not discussed anything about an abortion with appellant. He was assuming that an abortion was going to be performed. Also, at that time he assumed appellant had the money. Arriola got the money from the officers prior to that time. Nelder said he did not ask appellant to make any written statement for him and sign it, that appellant said he did not want to answer any more questions, and asked for an attorney. Asked if appellant denied all of his questions, Nelder answered, "Principally he did." When asked about the money, appellant at first denied he had the money; about performing any abortion, appellant denied it. Nelder could not say that at that time he knew appellant had not performed an abortion in that room; he realized that Arriola was not going to have an abortion performed, for he had instructed her not to be touched, had volunteered that statement to her. Asked if appellant did not tell him he did not desire to be cross-examined by Nelder, that he wanted an attorney, Nelder replied, "He said he didn't want to answer any more questions, he wanted his attorney, yes, sir." Asked if that was appellant's privilege, Nelder responded, "He was granted that privilege." Asked if when he came into the room and asked for the money, Arriola told him where it was, he said, "No," adding, "Dr. Crain told me where it was," and "I don't remember her telling me where it was."

Arriola testified that as the officers came in Crain had his back to the door; that she was expecting them, that they were overdue. She remembered the officers grabbing Crain. She said it was she who told the officers that Crain had put the money in his left-hand pocket.

Appellant testified: I was astonished when Arriola handed me some money; I had not expected a fee, thought I was doing a favor. At that time there came a sharp rap on the door. Arriola jumped up and opened it, and Nelder and Vandervort came in, and in the meantime I was—just reflexly—I had the choice, I couldn't hand the money back to her because she moved; I couldn't drop it on the floor, and I put it in my pocket. The officers approached me. Mr. Nelder, I believe it was, took me by the coat lapels and said, "Where's the money? Where's that money?" I

said "What money?" He said, "That money you got for—for the abortion you're going to do." I said, "Abortion? What abortion?" and Mrs. Arriola said, "Oh, it's in his pocket, in his rear—in his left pocket." He took the money from me, put his hand in my pocket and took it, whatever was in my pocket, and there it was, the money. It all happened so quickly. Next, I believe it was Nelder who asked me what all those instruments were for, and I said, "Well, I was intending to examine this lady." And it wasn't until that time that I realized that they were police officers. I thought when they entered the room that it was either the owner of the room or perhaps a badger game, and maybe it might be her husband. I am not used to examining women without a nurse around. I was a little confused. Nelder asked me some questions. I did not refuse to answer any of them. I answered his questions. When I found what he was driving at, I refused to answer his questions. As soon as I got it through my head he was accusing me of doing an abortion with those particular instruments I had there, I think I stated to him I preferred to have an attorney do my talking for me. Up until then I did not remain silent and refuse to answer his questions. Later, Nelder asked me to sit down on the bed and help him copy off the serial numbers. He checked them off, and took me away from there sometime later. He took me to the apartment where I lived and where Mr. Farrell lived. He asked me if I knew Farrell and I said, "Yes." On the way over to the apartment I rode alone with Officer Vandervort. They did not take me to my apartment. We went to Farrell's.

As to the slip of paper with the name Dorothy Ormond on it, and the envelope addressed to Farrell, appellant testified: I received each from Farrell at the same time. There was a discrepancy in the name on the envelope, and Farrell said to me, "I guess that's the girl friend [of Arriola]." I don't know of any reason for writing a telephone number down. Farrell offered some explanation of it. It seems to me that if I had to call—that Arriola—I didn't know her by that name at that time—would not be known there, so I had this woman's name that was supposed to be registered there, this slip with the name Dorothy Ormond written on it. Farrell gave me that at the same time. I did not ask him why he wrote all of the information down twice. I did not at any time ask who Opal Jackson was. I did not go to see her.

This "other evidence" seems as corroborative of the testimony of Crain as of the testimony of Arriola. The instruments he had and was planning to use were such as any doctor might have, standard for a physician engaged in treating the diseases of women. The catheter which he had made ready could be used either in testing for pregnancy or in attempting to bring about a miscarriage. He was a licensed physician and surgeon and as such had the right to possess the instruments in question.

The slip of paper with the name "Dorothy Ormond" on it seems innocuous, given Crain by Farrell as the name of the person wishing to see a doctor, a name very like "Dorothy Norman" under which Arriola registered at the hotel. The significance of the name "Opal Jackson" on the envelope in Crain's possession, and the fact that someone of that name registered at the hotel a few days before, is purely speculative.

The fact that Crain had the money in his possession also supports his testimony as much as it does that of Arriola, and is as consistent with innocence as it is with guilt, especially in view of her testimony that she had no arrangement or discussion with him concerning money or a fee.

The evidence concerning his conduct and responses to the officer's accusatory statements and questions is in the same category. There was the element of surprise when the officers entered the room. He was unaware, at first, as to their identity and what it was all about. That was followed by definite nonincriminating responses, and then he refused to answer further because he preferred to have an attorney do the answering for him, as was his right. This is the weakest kind of "corroboration," if it may be called such. We consider that at most it raises a mere suspicion of guilt, falls short of evidence tending to connect Crain with the commission of the alleged offense. And proof of the commission of that offense, in this case, depends upon corroboration of the woman's testimony, which corroboration is lacking.

This case, upon its facts, is very similar to *People* v. *Murphy*, 60 Cal.App.2d 762 [141 P.2d 755], where the charge was that defendant used an instrument upon the person of a certain woman with intent to produce a miscarriage. He was convicted and appealed. The record showed a conflict between his testimony and that of the woman. He vigorously contended that no condition of pregnancy existed in the prosecutrix and that he did not treat her for any such condition; that he treated her for a polyp condition. He

was a licensed physician and surgeon. The sufficiency of the evidence depended upon corroborating evidence. Certain surgical instruments belonging to the defendant were introduced in evidence. Defendant had a conversation with a police officer which defendant admitted having, and testified that the instruments in evidence were such as are found in the office of any physician specializing in that branch of medicine to which he devoted his efforts. Asked by an officer if he understood they were investigating reports that he had been doing abortions, defendant said "Yes." Asked if he would show them the "instruments and medicines that you use in performing these abortions," he said, "I will." A doctor who examined the prosecutrix after the event charged, said that her condition could have resulted from a number of various causes and that he was unable to say which was the cause. Admissions and a confession made by his codefendant were admitted in evidence, limited to the defendant who made them, not applicable to this defendant.

Of the corroborative character of such evidence, the reviewing court in the Murphy case said: "In whatever light the corroborative evidence in this case is viewed, nevertheless, in order to give it effect, even as tending in that direction, it is necessary at every point to interpret and explain the 'corroborative circumstances' in the light of the testimony of the prosecutrix. Before it can be said to connect the defendant Murphy with the commission of the crime charged against him, recourse must be had to the testimony of the prosecutrix. And, though we may concede that such corroborative evidence arouses a suspicion, even a grave suspicion, nevertheless it is not sufficient to establish the corroboration required by law. Furthermore, when viewed without recourse to the testimony of the prosecutrix, the 'corroborative circumstances' standing alone, while they may be said to generate a suspicion of guilt, are as compatible with innocence as they are with guilt of the crime denounced by section 274 of the Penal Code. Hence, the corpus delicti of the crime charged herein was not proven (*People* v. *Gilbert,* 30 Cal. App.2d 321, 323 [86 P.2d 135]; *People* v. *Braun,* 31 Cal. App.2d 593, 602 [88 P.2d 728]; *People* v. *Davis,* 210 Cal. 540, 555 [293 P. 32]). Unless the 'corroboration' furnishes inculpatory evidence—that is, evidence tending to connect the defendant with the offense, then there is no legal and sufficient corroboration (*People* v. *Morton,* 139 Cal. 719, 724 [73 P. 609])." (60 Cal.App.2d, at p. 772.) Respondent

criticizes the Murphy decision and claims that *People* v. *Ramsey*, 83 Cal.App.2d 707 [189 P.2d 802], correctly holds that the sufficiency of the "other evidence" to corroborate rests wholly with the triers of fact. There is language in the Ramsey case that might be so interpreted if read outside the context of the facts there presented. The defendant therein did not take the stand, did not controvert the prosecutrix's testimony. The defendant's possession of instruments and drugs suitable for use in producing an abortion was not innocuous, because she was not licensed to practice medicine and surgery. A medical expert who examined the woman within about an hour after the alleged operation and while she was still at the defendant's premises, testified that his impression was, at that time, that this was a pregnant uterus of approximately six weeks, and that there was some bleeding, suggesting that she was possibly threatening to abort or could already have aborted; and that about two weeks later he again examined her and found that her uterus was about half the size it was at the time of his first examination. In addition, two officers testified that on the day on which the offense was alleged to have taken place they had conversations with the defendant in which she made definitely self-incriminating statements (see 83 Cal.App.2d, at pp. 713-14). That was "other evidence" which, standing alone, without recourse to the testimony of the prosecutrix, tended to connect the defendant with the commission of the crime charged against her. The weighing of that evidence was properly the function of the jury, not that of the reviewing court. Accordingly, the requirement that the "other evidence" must, without recourse to the testimony of the prosecutrix, tend to connect the defendant with the offense (not merely generate a suspicion of guilt), was met and satisfied by the corroborative evidence in the Ramsey case but not in the Murphy case. That, as we see it, is the basic difference between the two cases. It reconciles the affirmance of the judgment of conviction in one and the reversal in the other. In *People* v. *Malone*, 82 Cal.App.2d 54, at page 59 [185 P.2d 870], in commenting on the Murphy case, the court said, "All that the Murphy case holds, as we read it, is that the corroborative evidence did no more than 'generate a suspicion of guilt' and that it was, therefore, insufficient." In *People* v. *Wilson*, 25 Cal.2d 341, at page 347 [153 P.2d 720], the Supreme Court expressed the rule in these words: "So long as corroborating evidence creates more than a suspicion of guilt,

it is sufficient even though it 'be slight and, when standing by itself, entitled to but little consideration.' [Citing cases.]''

We do not rest our decision in the instant case solely on the ground that the ''other evidence'' did no more than generate a suspicion of guilt. Its consideration was given the jury without adequate instruction. ■■■ The jury received from the court no definition of an extrajudicial admission; no admonition to view with caution evidence that purports to relate an oral admission of a defendant; no information that the guilt of a defendant cannot be established solely by evidence of an admission made out of court; and no instruction that accusatory statements and questions addressed to a defendant out of court are not received in evidence to prove their own truth, but only to explain the answers and the conduct of the defendant in the face thereof, and that, unless the jury find that such answers and conduct at the time indicated admission of the truth of such accusations, the jury should entirely disregard such accusations. Nor were they told that they must separately decide the question of the innocence or guilt of each of the defendants. In respect to the conspiracy charge, they were not told that each defendant was individually entitled to and must receive the jury's determination whether or not he was a member of the alleged conspiracy, if any existed, and that no evidence of an act or declaration of an alleged conspirator may be considered against another alleged conspirator unless and until, without the aid of such evidence, a conspiracy as alleged, with both such persons members, has been proved to have been in existence at the time of such act or declaration. Although the court gave instructions on the law relating to attempt to commit abortion and conspiracy to commit abortion which were correct as far as they went as statements of general principles of law (similar to instructions described and criticized in the Murphy case, at page 773 of 60 Cal.App.2d), they were incomplete and inadequate as statements of the law applicable to the facts of this case, because of the omissions we have noted. These omissions are of the greater significance because of testimony received of certain extrajudical statements made by defendant Farrell in the absence of appellant, and of the testimony of the prosecutrix concerning her conversations with Farrell outside the presence of appellant. Although during the course of the trial the court did admonish the jury that any conversation with one defendant outside the presence of the other ''is not binding on the other defendant,''

we find in the instructions given at the conclusion of the trial no admonition, when considering the case for or against one defendant, to disregard completely any evidence that was admitted only as to the other defendant. We are not prepared to say that the omission of such an admonition was error in the absence of a request by appellant for an instruction on that point, but it is an added circumstance. We cannot say that appellant was not prejudiced by the errors mentioned. The jury well might have reached a different verdict had they been fully and adequately instructed.

We should state that the record upon this appeal is silent concerning what, if any, instructions were requested by any of the parties, and given or refused. We must assume, therefore, that none were requested. (Rule 52, Rules on Appeal.) ▮ However, the trial court, even in the absence of a request, has the duty to instruct the jury, as to all rules of law that are necessarily involved in a decision of the cause. Thus, ''An instruction is necessary if it is vital to a proper consideration of the evidence by the jury. [Citing cases.] Accordingly, it has been held that the court must of its own motion instruct the jury in criminal cases with respect to accomplices and their testimony [citing cases], corroborative evidence in cases involving the obtaining of property by false pretenses,'' and ''admission of confessions and the necessity of independent proof of the corpus delicti,'' among others. (*People* v. *Putnam,* 20 Cal.2d 885, 890 [129 P.2d 367]. See, also, *People* v. *Hamilton,* 33 Cal.2d 45, 50-51 [198 P.2d 873].) ▮ The instructions and admonitions which we hold were erroneously omitted in the instant case are in that category. ▮ The observations which we have made concerning the insufficiency of the evidence to support the conviction of an attempt to commit an abortion, and the inadequacy of the instructions, apply also to the insufficiency of the evidence to support the conviction of conspiracy to commit abortion, and the inadequacy of the instructions applicable thereto.

The judgment and the order appealed from are reversed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied March 16, 1951, and respondent's petition for a hearing by the Supreme Court was denied March 29, 1951. Edmonds, J., and Spence, J., voted for a hearing.