[Crim. No. 6234. Second Dist., Div. One. Jan. 7, 1959.]

THE PEOPLE, Respondent, v. LOUIS J. SPIVAK, Appellant.

Joseph M. Rosen, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from the judgment and from the denial of the motion for a new trial in the causes wherein the defendant was convicted of two counts of armed robbery in the first degree, and one count of kidnapping.

In an indictment returned by the grand jury of Los Angeles County Louis J. Spivak, Richard McFall, Wayne Burke and Alfred J. Pope were charged in count I with robbery, in that they did, on or about June 18, 1957, by force and fear, take from the person of Lauritz Melchior certain personal property in violation of section 211, Penal Code.

In count II the same defendants were indicted for the crime of robbery for taking personal property at or about the same time from Mrs. Lauritz Melchior.

In count III the same defendants were charged with kidnapping for the purpose of robbery, in that they seized one Willa Huber while armed with deadly weapons, with intent to hold and detain her for the purposes of committing robbery.

Spivak was charged with five prior convictions, having started to serve prison terms in about 1942 in New York State,

and continuing down to 1954, when he started serving a term in the California prison system.

In the indictment it was also alleged that Burke had two prior convictions, one for robbery and one for escape. The indictment above referred to was numbered 192231, and was filed on June 25, 1957.

On August 26, 1957, the appellant moved to dismiss the indictment numbered 192231 under section 995, Penal Code. That motion was continued to September 12, 1957, and on that date it was continued to September 25, 1957.

On September 13, 1957, an indictment numbered 194773 was returned, wherein Spivak alone was charged with the same three counts heretofore listed and the five prior convictions. The motion made under section 955 was withdrawn. On the second indictment Spivak pleaded not guilty and denied the prior convictions.

The defendant McFall changed his plea to guilty as to count I of robbery, and waived a jury trial as to the five prior convictions charged against him.

The defendant Pope changed his plea to guilty as to count I of robbery.

Severance of Spivak and Burke was granted as to the first indictment, which indictment was to be tried with the second. The causes were consolidated for trial, which started on or about November 21, 1957.

Spivak and Burke waived formal rearraignment, and Spivak, as to both indictments, admitted the alleged second, third and fifth prior convictions, and denied the alleged first and fourth prior convictions. Within due time, and during the presentation of the prosecution's case, the district attorney moved, pursuant to section 1099, Penal Code, that Burke be discharged for the purpose of becoming a witness for the prosecution. The motion was granted. Spivak's motions for a dismissal, and then for a mistrial, were denied.

The jury found the defendant guilty as charged in all three counts, and of having been armed at the time of the commission of all three named offenses. Further, the jury found the robbery to be that of the first degree.

Spivak moved for permission to file an application for probation and for a new trial. The court permitted him to file the application for probation although it was obvious that he was not eligible for probation under the law (Pen. Code, § 1203). The court found the allegations with reference to the second, third and fifth prior convictions (pursuant to Spivak's

admission) to be true, and denied the application for probation. The application for a new trial was denied, and appellant was sentenced to the state prison, the sentences to run concurrently.

This appeal is from the judgment of conviction and the denial of the motion for a new trial.

Because of the contentions of the appellant hereinafter set forth, a résumé of the facts in general is given, and thereafter a résumé of the particular testimony of certain witnesses.

Spivak, McFall and Burke all met in Folsom prison while each was serving a term therein. Spivak was released in 1956, and came to Los Angeles County. He moved into the Bristol Hotel in May, 1957, where he registered under the name of Joseph Stearns. On June 13, 1957, Spivak met McFall on the street in downtown Los Angeles. On June 15, 1957, Spivak and McFall met again by arrangement. Spivak apparently had been writing bad checks, and had written one for his hotel rent and wanted to move therefrom without attracting much attention. Spivak and McFall entered into an agreement whereby Spivak would purchase television sets with worthless checks and McFall would sell them.

Howard L. Nichols, an ex-convict, knew Spivak and McFall while in prison. Several days before June 18, 1957, Spivak, McFall and Nichols drove in an automobile into the Hollywood hills, and at one place parked in a wide spot on the road where they could overlook what appeared to be the San Fernando Valley.

The location just referred to was later determined to be about 100 yards from the residence of Lauritz Melchior Either while riding in the vicinity, or while parked there, Spivak stated to those who were with him that he formerly had an orchestra and had played in that area, and also that he had been a house guest in that area.

Lauritz Melchior met Spivak at an encampment of the Bohemian Club (San Francisco), in 1947, and thereafter, in August, 1947, Spivak worked for Melchior in and about his estate in Los Angeles County for about two weeks. Spivak apparently stole something from the Melchior residence, and left the employment without Melchior's knowledge or consent. During the time he was employed in the Melchior household, Spivak had access to all of the rooms in the house, and resided there. The buildings at the estate at the time of the trial were about the same as they were when Spivak was employed there.

On June 18, 1957, Willa Huber and Charles Luscher lived and worked in the Melchior household, which consisted of Mr. and Mrs. Melchior and the mother of Mrs. Melchior. Shortly after 10 o'clock p. m., Willa Huber was awakened in her apartment by a noise at her door. McFall and Burke, both armed, entered and said, "this is a holdup." Upon learning that she did not have a key to the main part of the house, they directed her to dress and then forced her to go to the main house, which was about 100 feet from her apartment, and to ring the doorbell. The doorbell was answered by Charles Luscher and Mrs. Melchior. When the door was opened the two robbers forced Willa Huber into the house and required her to lie down upon a couch. Both men pointed their guns at Mrs. Melchior. Burke stated that it was a holdup and asked "Where is your big diamond?" Mrs. Melchior was then forced to locate and to press the button which would electrically actuate and open the front gate. Alfred J. Pope then entered the front gate and drove an automobile from the street up the driveway to the house. Burke told Mr. Melchior it was a holdup and forced him to go to the basement and open the fur safe located there. Melchior and Burke then went to the trophy room, where Burke inquired of Mrs. Melchior, "Where is the ring and other stuff?" She said she would show it to him. The particular ring referred to was one which she had owned and worn when Spivak had worked there. They then went into a bathroom, where Burke removed several pieces of jewelry from a drawer. At that time Burke's stocking mask broke and Mrs. Melchior was able to see his face. Burke then struck her. They returned to the living room and Mrs. Melchior was then taken to the safe located in the library, and she gave Burke $300 and some more jewelry and some furs. They went back to the living room and Burke inquired, "Where is the pistol?" Burke then got Mr. Melchior's pistol. The robbers then left. During the course of the robbery money in excess of $500, and other personal property, including jewelry and furs insured for over $100,000, were taken.

## McFALL

McFall pleaded guilty to count I, the robbery of Lauritz Melchior, and at the time of testifying was awaiting a hearing upon his application for probation and sentencing. In brief, McFall testified as follows: That he met and knew Spivak in Folsom and San Quentin prisons. He was released

from Folsom prison in 1955, and had resided in Los Angeles County since that time. Further, that he and Spivak met for the first time since his release, in downtown Los Angeles on about June 11, 1957, where they exchanged addresses and telephone numbers. Spivak was then residing at the Bristol hotel under the name of Stearns. The two of them later met at the Bristol hotel where Spivak told McFall that he had a "good score" (which, in their parlance, meant that Spivak knew where they could make an illegal gain). That Spivak stated to him that he was familiar with the Melchior residence, and that knowing that Melchior had a very substantial amount of money and jewelry there, he would like to see him, that is, McFall, and one or two others, rob the place and divide the proceeds with him. Spivak stated that he formerly had been a house guest at the Melchior home. That night, at the Alibi Room, a bar on Crenshaw Boulevard, McFall spoke to Burke about the proposed robbery. On June 14th or 15th, 1957, he met with Spivak at the Bristol hotel, where he told Spivak that he had secured one man to go on the robbery, and perhaps one other. They discussed the grounds of the Melchior estate and some of the personal property which might be obtained; Spivak specifically mentioning a large emerald ring and a large diamond ring, each valued at about $20,000, and a large sum of money. Spivak told him that he would draw a diagram of the grounds and another of the house. Spivak further stated, however, that he did not want to be involved by having his name mentioned to any of the persons who were to participate in the robbery.

McFall also testified that Spivak wanted to leave the Bristol hotel because he had given a bad check to the hotel for the rent. Spivak and McFall came to an understanding that a false telegram would be sent to Spivak at the hotel which would falsely set forth that some relative of Spivak's was ill and that his presence was needed. McFall further testified that he sent such a telegram to "Joe Stearns," the name Spivak was using at the hotel.

On Monday, June 17, 1957, McFall helped Spivak move to McFall's hotel, the Harvey, on Santa Monica Boulevard in Los Angeles. Before arriving at the Harvey hotel they talked about the floor plan of the Melchior house, and Spivak gave McFall maps and drawings of the premises and the house. These drawings showed the electrically controlled gate which Spivak had told McFall operated from a button or buttons within the house. McFall testified further that three or four

days before the robbery, McFall, Spivak and Nichols had been in the vicinity of the Melchior estate, having gone there in McFall's automobile. Nichols was a passenger. McFall did the driving and Spivak directed McFall where to go. After several attempts they located the entrance to the estate (the gate of the Melchior residence), but they did not, at that time, get out of the car. McFall never had been there before. Later, McFall, Burke, and perhaps Nichols, drove to the same location.

Spivak was to get one-third of any proceeds of any robbery of the Melchior establishment. McFall or his accomplice was to sell the jewelry.

McFall told Spivak that he was "dubious as to the condition of two of the tires on my car." Spivak said he would issue a worthless check to buy "a couple of tires for the car." They went to Sears, near Western and Santa Monica, and there Spivak issued a check for the tires, tubes and an air seat for McFall's automobile. The robbery was talked of and discussed on the afternoon of the robbery by Spivak and McFall.

McFall further testified that he and Burke and Pope, on the day of the robbery, drove to the Melchior residence and arrived there about 10:30 o'clock p. m. That Burke and McFall climbed the fence and went onto the grounds, Pope remaining outside in the car. Burke and McFall each had a pistol and wore a mask. They entered the maid's room with guns pointed at her, and directed that she take them to the main entrance, which she did. They were let in and then told the Melchiors that it was a holdup. They stayed about 20 minutes, and during this time, McFall asked Mrs. Melchior if she had a diamond ring and an emerald ring, each worth $20,000, and she answered that she had such. Burke pressed the button opening the gate entrance and Pope entered. McFall got some jewelry from a dressing room and a gun from Mrs. Melchior, which latter he kept, and he gave his own gun to Pope. McFall got "the two rings of value" plus other things. Burke and McFall and the Melchiors went to the safe, where Mrs. Melchior got $300, which Burke took. McFall later got approximately one-half of this, and subsequently gave $10 or $20 to Spivak. They also took various furs. Burke and McFall then tied up the Melchiors, and the three robbers left in Pope's car. Burke and McFall then left the Pope car and got into McFall's automobile, leaving some of the jewelry and furs in Pope's car. They agreed to meet at the apartment of John Heath, the bartender of the Alibi

Room bar. McFall and Burke got to the apartment first and divided the money. They agreed that Burke was to dispose of the jewelry, however, in the event he was unable to do so, McFall was to attempt to dispose of it. Pope took the furs. McFall then drove Burke to the Alibi Room and he went on to the Harvey hotel. He met Spivak and Nichols there at the hotel, and McFall gave Spivak some money. McFall told Spivak and Nichols about the robbery. They then listened to a radio to hear of the robbery. On the next day Spivak and McFall talked of the robbery and Spivak was told that two other men had participated in the robbery with McFall. McFall went to San Francisco and then on to Montana, in which state had previously served in the state prison, and he was arrested in Montana on August 10, 1957.

<h3 style="text-align:center">BURKE</h3>

The charges against Burke were dismissed under section 1099, Penal Code. A résumé of Burke's testimony is as follows: He first knew McFall in Folsom prison. He met Pope at the Alibi Room a few days before the robbery. McFall had told Burke that Spivak had a good "score." Later in another talk McFall told Burke that Spivak had been a guest at the Melchior home and that Spivak was the brother of Charlie Spivak. McFall had said that Spivak knew the layout of the Melchior house and where the safes were located. They discussed the electrically controlled and operated gate. Later, he, McFall and Nichols drove up Mulholland Drive and located the Melchior residence, and examined the place. McFall had said there was $300,000 in jewelry and $60,000 in cash to be had, and that he had secured this information from Spivak. On Monday, June 17, 1957, he, Burke, agreed to go on the robbery. On Tuesday, June 18, 1957, McFall and Burke met at the Alibi Room where McFall showed Burke maps of the grounds of the Melchior estate. McFall stated that one-third of the returns from the robbery were to go to Spivak. Burke told Pope, who was at the bar, of the proposed robbery, and Pope agreed to go with them. They agreed to, and did meet at 8:30 o'clock that evening near the Alibi Room. Before this McFall (also called Murf) told Burke there was a $20,000 ring and furs to be had. They went to within about a half-mile of the Melchior estate in two cars, parked the McFall car and all continued to the Melchior estate in Pope's car. They were armed with two pistols. McFall and Burke went over the fence at the estate. The door to the Melchior residence

was locked, so they went to the maid's room where the door was open, awakened her and stated that it was a robbery. They pointed a gun at her and told her to get dressed. Upon their instructions she then went with them to the Melchior house where she knocked on the door or rang the buzzer, and the door was then opened. Burke told Charles Luscher, and Mr. and Mrs. Melchior that it was a robbery. Mrs. Melchior showed them the location of the button that was used to open the gate and Mrs. Melchior pressed it. Pope then drove in. Burke told Melchior to take him to the fur vault which he, Burke, knew about because McFall had told him. Burke and Melchior did go to the fur vault in the basement and got the furs. Burke had been told of two other safes in the house and he asked Melchior where they were and Melchior told him where the safes were located. They went to the safe in the library and then returned to the living room. Burke went back to the safe in the library, joining McFall and Mrs. Melchior who handed Burke an envelope containing $300. Burke then went with Mrs. Melchior into the bedroom and got a fur coat; McFall and Burke then tied up the victims while Pope put the furs into his car. The robbers then left. Burke and McFall went to Heath's apartment. McFall emptied a brief case of jewelry. Burke gave Pope $60, and McFall and Burke took the remainder. Pope took the furs and Burke took the big jewelry and "stashed" it. The next day McFall and Burke met, and the former wanted to dispose of the jewelry at once but Burke refused. Burke was fearful of what McFall might do because Burke was of the opinion that McFall was a narcotic addict. Later, Burke and Officer Jokisch recovered the jewelry and they then went to Pope's apartment and recovered the furs.

## SPIVAK

Spivak stated that he had worked for the Melchiors in 1947 for two or three weeks as a chauffeur and gardener, however, that he was not allowed inside of the house; that he did no house cleaning nor making of beds, nor was he informed as to the location of any safes. He said he was only in the house twice, and then only as far as the kitchen. Further, he said that the entrance gates were manually operated, and not electrically operated; that he had no knowledge of the telephones in the house, and that he never took a ride into the Hollywood hills with McFall and Nichols. He knew McFall in Folsom prison, and while there discussed with McFall and a man by the name of Baker the jewelry belonging to Mrs. Melchior.

Spivak had come to Los Angeles in September, 1956, after his release from Folsom, and in May, 1957, moved into the Bristol hotel under the name of Joseph Stearns. He was using a fictitious name because he had written bad checks. He met McFall in Los Angeles on Thursday, June 13, 1957, and had spoken to him about having written a bad check in payment of his hotel rent, and stated that he, Spivak, would have to leave by Monday, June 17th. They arranged to meet at the Bristol hotel on the next day. On Saturday, the 15th, McFall and Spivak met at the latter's hotel, and McFall agreed to send Spivak a false telegram that would, on its face, give a reason for Spivak's leaving the hotel. They also made an arrangement whereby Spivak would issue worthless checks to purchase television sets which McFall would sell, and they would then divide the proceeds. They then went to the Harvey hotel, joining Nichols. They talked of the Melchior residence and how it appeared. No mention was made about "scoring" on the place. The three went to a drive-in to eat. On Monday McFall sent a telegram to Spivak stating that Spivak's mother was ill. Later McFall appeared and they agreed to, and did move Spivak to the Harvey hotel where McFall was staying. They also agreed to secure some more television sets. They went to the Hollywood Music City store and Spivak issued a worthless check for a television set. Spivak, McFall and Nichols went to Sears, where they purchased with a worthless check another television set, and also bought some tires under the same plan. Spivak stated that McFall had agreed to give Spivak $10 each for two tires for his car. After leaving there, McFall sold one of the television sets, but was unable to sell the other. They returned to the Harvey hotel, where Spivak put the remaining television set in his room. McFall gave Spivak $20 and told him that he had sold the first television set for $80, and had collected $35 or $40 of such amount, and was to get the balance the next day. The next day Nichols, McFall and Spivak had breakfast together and he, Spivak, demanded the remaining money due him for the television set and for the tires. Later Spivak went to the races. That night Nichols came by and watched television with Spivak. At about 11 or 11:30 o'clock Nichols left and Spivak went to bed. The next morning at about 2:00 or 2:30 o'clock a. m., Spivak was awakened by Nichols who told him that McFall wanted to see him, and Spivak and Nichols went to McFall's room where Spivak again demanded his money from the television set sale and for the tires. McFall told Spivak that he would get the

money for him the next day, and then asked Spivak to drive him to Lancaster, which Spivak refused to do.

The next morning Spivak, Nichols and McFall had breakfast together and again Spivak asked McFall for money, and the latter promised to get it for him. McFall and Nichols left together and later on Spivak went to a movie. That day Spivak read in the newspapers of the Melchior robbery and wondered if McFall could have done it, remembering that they had spoken of the Melchiors a few days before. Spivak said he decided that McFall had not done it, and on Thursday morning he, Spivak, checked out of the hotel. He had waited for McFall but McFall had not returned, and as Sears was across the street from his hotel, he had decided it was time to leave, but that he did not leave because of the Melchior robbery. Before leaving the hotel Spivak sold the remaining television set for $75 to a man in the restaurant. Spivak and Nichols went downtown and checked into another hotel, and on that day Spivak saw the names of Morgan and Pope in the newspapers, and on Friday night Spivak left Los Angeles. At that time Spivak's name also appeared in the Los Angeles papers. On August 3, 1957, Spivak was arrested in San Francisco. Spivak stated that he had never discussed the Melchior robbery with McFall, nor did he draw any map of the Melchior's house or premises.

Spivak, the appellant, now contends that there was (1) insufficient corroboration of accomplice testimony; (2) that errors occurred in the admission of evidence, and (3) in the remarks of the trial court, and (4) in prosecuting Spivak under two indictments.

Section 1111, Penal Code, provides as follows:

"A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof..

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

The Supreme Court of California has recently had occasion to speak on the problem involved in this case. ██ In *People* v. *MacEwing*, 45 Cal.2d 218, at page 225 [288 P.2d 257], it was said:

"The decisions applying section 1111, relating to accomplices, hold that the corroborative evidence required by that provision must be considered without the aid of the testimony which is to be corroborated and that it is not sufficient if it requires the interpretation and direction of such testimony in order to give it value. (Citing cases.) There are two opinions which, although not clear, indicate that a similar rule applies with respect to section 1108. (See *People* v. *Crain,* 102 Cal. App.2d 566, 579 [228 P.2d 307] ; *People* v. *Murphy,* 60 Cal. App.2d 762, 772 [141 P.2d 755].) In our opinion both statutes must be construed to mean that corroboration is not adequate if it requires aid from the testimony of the person to be corroborated in order to connect the defendant with the commission of the offense charged. The instruction is therefore erroneous."

And in *People* v. *Brown,* 49 Cal.2d 577, at page 584 [320 P.2d 5], it is set forth:

"The People rely also upon the testimony of Dr. Randall, who treated Clara on January 30, 1956, as corroboration. The doctor's testimony does not meet the test of connecting defendant with the abortion which Clara underwent. *People* v. *Ramsey* (1948), 83 Cal.App.2d 707, 713, 717[4] [189 P.2d 802], is inconsistent with *People* v. *MacEwing* (1955), *supra,* 45 Cal.2d 218, 255 [7], insofar as it suggests that testimony which does not itself connect the defendant with the criminal abortion is sufficient corroboration; in this respect the Ramsey case does not represent the law and, to avoid possible confusion, is to that extent disapproved."

■ In *People* v. *Santo,* 43 Cal.2d 319 [273 P.2d 249], the court said (at p. 327) :

"The accomplice need not be corroborated as to every fact to which he testifies. ■ The evidence which corroborates the accomplice need not be direct; it may be circumstantial. ■ Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant. (Citing cases.) ■ To be sufficient the implicating evidence 'must relate to some act or fact which is an element of the offense.' (*People* v. *Gallardo* (1953), 41 Cal.2d 57, 63 [257 P.2d 29].)"

In *People* v. *Lyons,* 50 Cal.2d 245 [324 P.2d 556], the court said (at p. 257) :

"The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of

the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged. [Citing cases.]''

■ The evidence required by the section in question may be sufficient, even though slight and entitled to but little consideration when standing alone. (*People* v. *Wayne*, 41 Cal.2d 814, 822 [264 P.2d 547] ; *People* v. *Walker*, 88 Cal.App.2d 265 [198 P.2d 534].)

■ In *People* v. *Perry*, 123 Cal.App.2d 74, the court said, at page 80 [266 P.2d 515] : ''Therefore, unless we can say that the corroborating evidence is either incompetent or is of such a character that it could not tend to connect appellant with the commission of the crime and could not reasonably support an inference of such connection, the finding of the jury on that issue cannot be disturbed on appeal. (*People* v. *McNamara*, 103 Cal.App.2d 729, 738 [230 P.2d 411].)''

■ ''The entire conduct of the parties, their relationship, acts and conduct during and after the crime, may be taken into consideration by the jury in determining the sufficiency of the corroboration.'' (*People* v. *Griffin*, 98 Cal.App.2d 1, 25 [219 P.2d 519].)

■ Applying the rules just set forth to the testimony in this case, we are convinced that there is ample corroboration of the accomplice testimony.

Nichols stated that he and Spivak and McFall drove to the Hollywood Hills to a location overlooking the San Fernando Valley. Nichols said the place where they parked had a ''wider shoulder''; he said Spivak claimed to have been a house guest there; that the location was near a white gate. Later on Nichols went to the location with Officer Vietti, Sergeant Buckley and another person, and parked at the same location where he had previously parked. Nichols told the police officers that it was the same location. Officer Vietti testified that the location, in fact, was on Mulholland drive about 100 yards down hill from the Melchior home. Spivak denied making any such a trip. The jury could very well have drawn the conclusion that Spivak was at the location in question and that he was there with McFall for the purpose of showing McFall the Melchior premises to the end that McFall could assist in committing the robbery. The testimony certainly corroborates

the story which McFall related, and relates to acts or facts which are elements of the offense. Furthermore, it is the type of corroboration which does not require aid from McFall's testimony in order to connect Spivak with the commission of the crime.

Further, by his own admissions, Spivak left the hotel where he was staying two days after the robbery and moved into a new hotel. On the next night he went to Santa Monica and then to San Francisco. He left the hotel even though he had paid a week's rent in advance. "Flight is a factor tending to connect an accused with commission of an offense." (*People* v. *Hoyt*, 20 Cal.2d 306, 313 [125 P.2d 29].) And further, ". . . 'corroboration need not be by direct evidence, but the entire conduct of the defendant may be looked to for corroborating circumstances and if, from those circumstances, his connection with the crime may be fairly inferred, the corroboration is sufficient.' " (*People* v. *Hoyt, supra,* p. 313.)

 The jury very well could have determined that the flight of Spivak was because of his involvement in the Melchior robbery.

It is also true that Spivak made statements as to material facts which were wilfully untrue. Spivak said he did not go to the Hollywood Hills, Nichols said he did. The Melchiors stated that Spivak worked inside of their house and had been in it on several occasions and had access to the rooms. Spivak denied having worked in the house. Mr. Melchior stated that the gate worked electrically when Spivak worked there. Spivak said that it worked manually, and that he did not know that it operated electrically and was actuated by any buttons.

 In *People* v. *Wayne, supra,* 41 Cal.2d 814, at page 823, the court said:

" '. . . But where a material fact is established by evidence and it is shown that a defendant's testimony as to that fact was wilfully untrue, this circumstance not only furnishes a ground for disbelieving other testimony of this defendant [citations], but also tends to show consciousness of guilt or liability on his part and has probative force in connection with other evidence on the issue of such guilt or liability. Such false testimony is in the nature of an admission from which with other evidence guilt or liability may be inferred. [Citations.]' "

 The denials of Spivak show a consciousness of guilt from which the jury could deduce that he had a connection with the robbery.

There are various other circumstances which by themselves, perhaps, would not supply sufficient corroboration, but when taken together do, in our opinion, make the appellant's contentions of little worth. Spivak worked for the Melchiors and had a knowledge of the house and grounds; while in prison he talked with McFall of the Melchiors and their jewelry; Spivak bought tires for McFall's automobile shortly before the robbery, and that automobile was used in the robbery, and further, Spivak was involved with McFall in a scheme to secure television sets illegally, to sell them and to divide the proceeds with McFall.

The jury could, and undoubtedly did take into consideration the relationship of the parties and their acts and conduct. (See *People* v. *Ross,* 46 Cal.App.2d 385, 395 [116 P.2d 81]; *People* v. *Griffin,* 98 Cal.App.2d 1 [219 P.2d 519].)

Furthermore, the jury could properly have considered the fact that Spivak and McFall were arguing about money. The jury could well have believed that the money which brought about the disputes between them was not the money from the sale of the television sets, but rather was that secured from the robbery.

Appellant's next contention is that the court erred in admitting certain testimony of Officer Vietti. The question put to the officer was:

"Q. (By Mr. Amstutz) Had you been informed that Mr. Nichols had gone to a certain location around the area of the Mulholland Drive?

"MR. ROSEN: I will object to that, again, as calling for hearsay.

"THE COURT: Overruled. A. Yes.

"THE COURT: Purely foundational."

The prosecution had already introduced evidence to the effect that Nichols, Spivak and McFall had driven into an area in the Hollywood Hills. Nichols had described the area, but he had not located it precisely. Later Nichols took a trip with Officer Vietti and others to the same location. The prosecution put the officer on the witness stand to tell of the location of the area where he and Nichols had gone. To explain the actions in taking the trip it was necessary and proper for the officer to state the circumstances giving rise to it. (See *Daniels* v. *United States,* 17 F.2d 339, 344; *Coleman* v. *State,* 43 Ga.App. 350 [158 S.E. 627, 628]; *Fitzpatrick* v. *Commonwealth,* 210 Ky. 385 [275 S.W. 819]; *State* v. *Rotolo,* 39 Wyo. 181 [270 P. 665, 667].)

Extrajudicial statements are, under circumstances such

as in the present case, admissible to show why a person did certain acts.

The second question put to Officer Vietti objected to by Spivak was:

"Q. (By Mr. Amstutz) Did you have some idea, Mr. Vietti, that the place where you were attempting to reach was up or in the area of the Melchior residence?

"Mr. Rosen: Object to that as calling for a conclusion.

"The Court: Overruled.

"Mr. Rosen: Hearsay. A. Yes."

In our opinion the question did not call for a conclusion as such term is used in discussing the law of evidence. The question really goes to the state of mind of the officer at the time he took the trip. He either thought he was going to the area of the Melchior house, or he thought to the contrary.

In any event, assuming the questions were improper, the testimony complained of did not bring about a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

The next contention of Spivak is that the court erred in admitting the conversations between the accomplices Burke and McFall. McFall, by his testimony, disclosed that a conspiracy existed, and such was corroborated. Burke told of the talks between himself and McFall. The direct testimony of a coconspirator is admissible and is competent to establish the facts to which he testifies. (See *People* v. *Steelik*, 187 Cal. 361, 377 [203 P. 78].) Once the conspiracy has been established, the extrajudicial declarations of a conspirator against his coconspirators are admissible. (Code Civ. Proc., § 1870, subd. 6.)

We find no error in permitting Burke to testify to the statements of McFall made out of the presence of Spivak under the particular circumstances of this case.

Appellant's next contention is that the judge erred in making a statement to the jury when he granted the motion of the district attorney to dismiss the matter as against Burke under the provisions of section 1099, Penal Code. The judge simply and properly explained the procedure to the jury. Any juror or layman might very well have wondered about the legality of such a procedure had there been no explanation in the first instance. The judge explained the matter fairly and correctly and that is all that we can find in his statement. A Texas court stated the matter succinctly in *Camron* v. *State*, 32 Tex.Crim.Rep. 180 [22 S.W. 682, 40 Am.St.Rep. 763], at page 682 [22 S.W.], wherein it said:

"From the earliest times it has been found necessary, for the detection and punishment of crime, for the state to resort to the criminals themselves for testimony with which to convict their confederates in crime. While such a course offers a premium to treachery, and sometimes permits the more guilty to escape, it tends to prevent and break up combinations by making criminals suspicious of each other, and it leads to the punishment of guilty persons who would otherwise escape."

The judge said, in so many words, "I am informed by the People and counsel for the defendant Burke that he proposes to fully and freely testify before this Court now concerning the same circumstances."

Lastly, Spivak contends that it was error to be tried under two indictments. In the first indictment he was indicted with three others, and in the second indictment the proceeding was against Spivak by himself. The two indictments were consolidated. See *People* v. *Follette*, 74 Cal.App. 178, 189 [240 P. 502], wherein the court said: ". . . The strict rules prevailing prior to these amendments often hampered prosecuting officers in their attempts to enforce the law and resulted in many miscarriages of justice. In view of the more liberal rules now prevailing in the institution and conduct of criminal proceedings, and after a consideration of the above authorities, we are of the opinion that there is nothing in the law of this state which affects the regularity or validity of the second indictment presented against the defendant."

In the present case the indictments were identical insofar as Spivak was concerned. Furthermore, Spivak made no objections and stated, in effect, through his counsel that the procedure adopted was satisfactory to him. He cannot now complain. Spivak was not prejudiced in any way.

A thorough reading of the entire transcript leaves no doubt in our minds that the appellant was fairly tried and properly convicted. Any error, if there was such, was not prejudicial to the appellant.

The judgment of conviction and the order denying a motion for a new trial are, and each is, affirmed.

White, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied January 26, 1959, and appellant's petition for a hearing by the Supreme Court was denied March 4, 1959.