[Crim. No. 6670. Second Dist., Div. One. Nov. 23, 1959.]

THE PEOPLE, Respondent, v. DONALD JAMES TODD, Appellant.

Seymour R. Winston for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Ernest E. Sanchez, Deputy Attorney General, for Respondent.

FOURT, Acting P. J.—This is an appeal from a judgment of conviction (order granting probation) and from an order denying a motion for a new trial in a case involving a violation of the provisions of section 274 Penal Code (abortion).

In an information filed in Los Angeles County the defendant was charged in Count I with the murder of Helen McKay in violation of section 187 of the Penal Code; in Count II he was charged with the crime of abortion in violation of section 274 Penal Code in that on or about May 23, 1958, he did unlawfully *"employ an instrument and other means"* upon the person of Helen McKay with the felonious intent to procure the miscarriage of said woman. The jury deliberated four and one-half days. The defendant was acquitted of the murder charge and was convicted of the abortion charge.

A résumé of the testimony is as follows: Helen McKay was a married woman with three children who was separated from her husband. Helen met Joseph M. Seibel, a real estate agent, sometime about Christmas of 1957. They saw each other frequently after that time. Seibel was married and had one child and was separated from his wife.

On the evening of May 22, 1958, Helen, her three children and her sister-in-law had dinner with Elva Lundahal, the

mother of Helen at the mother's home at 152 West Artesia Street, Pomona. Helen appeared to be in good health. Helen had some allergies and sometimes got a nasal irritation from certain weeds and would sneeze therefrom.

In March of 1958 Helen had told Seibel that she was pregnant. About March 15, Seibel and Helen had a conversation concerning her pregnancy and Helen said that she was pregnant and said "we are going to have to do something" and "I don't know, but we have got a problem and I will see you again." In another talk on about March 22, 1958, Helen told Seibel that the doctor wanted $350 "to eliminate her problem." On March 25, Seibel went to the Bank of America and borrowed $490. He gave $225 to Helen and she said she was going to give it to the doctor. Helen stated to Seibel on March 25 that she had an appointment to see a doctor in a few days and that she would give him $125 and would receive her first treatment and would see Seibel after the treatment.

In the third week in April, Helen told Seibel "I'm going to have to see the doctor again. The first pack didn't work." In the middle of May, Helen told Seibel "I'm getting desperate. Something has to be done and I mean now. I've got to see the doctor again" and "He's going to have to do something different, more than he's done in the past. Those other treatments, I just don't understand them. It doesn't seem logical to me." She asked Seibel to telephone the doctor and gave him the name of the defendant. During March and April in the conversations about the pregnancy and the termination of it, she had never mentioned the name of the defendant. On May 19 Seibel looked up the telephone number of the defendant and called him. Some six months or so prior thereto Seibel had talked to the defendant about a real estate transaction. Seibel gave defendant his name and defendant said, "Yes. I would like to talk to you. Could I see you this evening?" Arrangements were made and they met that night at the St. Charles Grill at about 8 or 9 o'clock. The defendant ordered some drinks and said, "We have a problem." Seibel replied, "Yes," and "Helen is getting awfully excited and she wants something done." Defendant said, "Well, I have to—I'm going to try to take care of her as soon as I can. I have to get some chemicals from the city, and that may take a while. That may take a day or two, but I'll call you as soon as I get them." The defendant said the chemicals were expensive and "Now, I'll call you as soon as I get them, and I want to meet you and Helen somewhere so don't do anything

until you hear from me." Further, it was understood that Seibel should call the defendant thereafter instead of Helen and if defendant was not in he was to say that the call was with reference to a second deed of trust. In the talk the defendant also said, "These things go on all the time. It's a shame that the laws of our society won't allow them to be taken care of in a legal manner." There never was, however, in the talk any explicit statement about the nature of the "problem" which confronted Helen.

Two days later, namely on May 21, Seibel received a call from the defendant wherein the defendant said in effect that he had the "stuff" and would like to see him that night at the St. Charles Grill. Seibel arrived there about 8 or 9 p.m. and saw defendant with Dr. Cavanaugh at the bar. The defendant left saying to Seibel, "You can give me a call when you are through." Seibel spent the next hour and a half or two hours with Dr. Cavanaugh, talking about some business property. About 11 p.m. or so Seibel called the defendant and was told by the defendant that it was late and that he would call Seibel the next evening about 6 or 6:30 o'clock.

The next day, May 22, Helen came to Seibel's office in the morning and stayed there off and on during the day. Seibel called for the defendant about 7:30 p.m. but did not reach him. At about 10 o'clock the defendant called Seibel and explained that he had been away and had gotten home late and would be free the next day. Arrangements were made to get together on the following day.

On the morning of May 23 arrangements were made to meet at 152 West Artesia Street, Pomona at 1:30 p.m. Helen stayed with Seibel the night of May 22 and was at Seibel's office on the morning of May 23. She left the office sometime during the morning of May 23. Seibel testified that Helen was in his presence during all of May 23 until her death except for a time after 1:30 p.m. when he made a personal call and for a time in the evening when he checked into his office and went to dinner. After lunch at about 1:30 p.m. Seibel and Helen went to 152 West Artesia Street. She appeared to be in good health at that time.

Helen's mother had left her house to go to work at about 1:20 p.m. When the mother returned home from work that day she did not notice anything out of the ordinary at the house. Helen had a key to the mother's home. Helen and

Seibel waited at the mother's house for a few minutes and the defendant drove up in a cream-colored sports car. The defendant got out of the car and said, "Is everything all right?" The defendant and Helen went into the house and Seibel remained outside for about 30 to 40 minutes. Helen carried a grip and the defendant had a little black bag when they went into the house. (Seibel testified at the preliminary hearing that Helen did not carry anything when she entered the house.) Seibel entered the house and went into the bedroom. Helen was lying on the bed, her face was flushed and she had a clammy appearance and Seibel said, "Boy she looks rough" and defendant replied, "Well, these things don't come easy." She appeared to be in a cold sweat, she was coughing deeply and "there were a few little moans." Defendant said, "It's sure odd how she has got an asthmatic cough. It sounds like she has asthma." The defendant talked with Seibel about the balance of the money owed to him. They talked about a check and defendant said, "I have done my part." Arrangements were made for Seibel to call the defendant about 8 p.m. that evening.

After the defendant left the house, Helen had difficulty in breathing and coughed considerably and was weak. She said, "It hurts in here," pointing to the area of her abdomen. Helen and Seibel left the house and went to the Huntington Motel where Seibel registered for them and they were assigned Unit Number 6. During the 15-minute trip to the motel Helen coughed considerably. Helen walked into Unit Number 6 and lay down on the bed. She was flushed and coughing. Her skin had a clammy feeling. She spit up a fluid-like substance which contained blood. She was fighting for breath. About an hour after their arrival at the motel Seibel left and returned about 6 or 6:15 p.m. at which time Helen was fully clothed on the bed, moaning, coughing and struggling for breath. Seibel noticed her leg was "twitching, moving, scraping up and down the bed." At about 7 p.m. he went out to get something to eat. Seibel called the defendant about 8 p.m. and told the doctor where he was and that Helen was still coughing and was "feeling pretty rough." The defendant arrived at and entered the motel Unit Number 6 about 8:30 or 8:45 p.m. Helen said, "It sure hurts me in coughing." The doctor indicated that she was having an asthmatic attack. Helen's fingernails were blue and the doctor stated that she needed oxygen. Seibel said to Helen "we can help you if you can make it" and they all left the motel at about 9 p.m. and

ultimately arrived at the doctor's office. Before leaving the motel Seibel gave the doctor a check made out to cash in the sum of $125. The check apparently was never cashed. At the doctor's office the doctor gave Helen oxygen and she responded to the treatment and stated that she had been bothered by hayfever. They left the doctor's office and returned to the motel and all entered Unit Number 6. Helen lay down on the bed and was weak though otherwise apparently normal. She had some of her own pills for hayfever and took some of the same.

The doctor and Seibel went outside and Seibel inquired of the doctor what he should do if her breath again became short and the doctor said, "call the fire department for a resuscitator and have you ever thought of a hospital?" The doctor gave Seibel the names of two hospitals and stated, "If you need me call me." This occurred about 10:30 p. m. The doctor left at about the same time. Seibel lay down for about 20 to 30 minutes and heard a noise like a gargling sound. He got up and noticed that a bloody sputum was coming out of Helen's mouth. She was fighting for air. Seibel went out to a telephone and called an ambulance and then called the defendant. The ambulance arrived in about 30 minutes and during the interval between the call and the arrival of the ambulance, Seibel noticed that Helen's fingernails were blue, her forehead was clammy and she was in a deep sweat and her leg was "scraping up and down the bed." There was blood about the bed and on the pillow.

When the ambulance attendants entered Unit Number 6 Helen was on the bed uncovered but clothed. There was a blood spot on her lower undergarment. An attendant was unable to find any pulse. She appeared to be in a coma. Oxygen was administered on the way to the hospital but the attendant did not know whether she "took" any of the oxygen. At the hospital a Dr. Klitenic, an intern on duty, examined Helen and found her to be dead. Seibel said, "My God, I've killed her." Dr. Klitenic palpated Helen's abdomen to determine the height of the fundus of the uterus. There was a gush of fluid from her peritoneal region which discolored her undergarments. The doctor made no examination of the fluid discharge and he did not examine the vaginal area. He estimated her to be three months pregnant. He did not remove the undergarments and did not see whether she was wearing a sanitary napkin. He made no examination other than palpating the abdomen to determine whether an abortion had been performed

and he did not discover anything which would indicate that an abortion had been attempted or committed on Helen.

Dr. F. Modglin, a pathologist (certified by the American Board of Pathology in pathologic anatomy and clinical pathology) performed an autopsy on Helen's body after it had been embalmed. The uterus contained a fetus which, from its size, indicated a pregnancy of over four lunar months duration. In his opinion the death resulted from shock which was evidenced by an acute hemorrhagic pulmonary edema which was principally due to an irritated intrauterine pregnancy. He never formed a fixed definite opinion as to the cause of the uterine irritation. The uterus was removed from the body. The external surface of the uterus was smooth with no perforations or superficial hemorrhage. The uterus contained an 18 cm. fetus completely surrounded by an intact amnion, chorion and clear amniotic fluid. It had an intact bag of water. There was no abnormality of the placenta. The lining of the lower one-third of the uterus was rough and red with various sized areas of hemorrhage. This irritation completely encircled the uterine cavity in its lower one-third. The cervical canal easily admitted the pathologist's small finger from the outside opening all the way along the mouth of the womb into the uterine cavity. There was no significant amount of bloody fluid or any blood or blood clots in the vagina. Helen was wearing a Kotex pad which was moderately moist but there were no large amounts of blood or blood clots. The irritation was inflicted upon the uterus between 6 and 24 hours before death. In the opinion of the pathologist the irritation was most likely one of a chemical nature; however, there was nothing about it to indicate it was caused by one single factor. Natural labor could have caused the condition. If it was chemically caused, any one of several chemicals could have caused it. It could have been caused by a chemical used in feminine hygiene such as Lysol or by any caustic antiseptic used in such hygiene. It was possible that the uterine irritation resulted in blood clots which broke loose and travelled to the lungs where they could have produced shock. The doctor found nothing in the course of the examination which indicated anything but good health. She did not die from an asthmatic attack.

The doctor stated that based upon his experience, his knowledge and his examination of the body he did not know whether or not an abortion had been committed.

The motel was owned by Mr. and Mrs. Huntington. She

stated that she had rented Unit Number 6 to Seibel about 3:30 p. m. on May 23. Further, that Seibel went to a telephone booth after he had registered and spent considerable time in the booth. She stated that in the evening she saw Seibel and a tall slender man, whose face she could not identify, helping Helen into the room. Mr. Huntington testified that he arrived home during daylight at about 5 p. m. and saw two men enter Unit Number 6 at about that same time.

Soon afterwards Mr. Huntington saw three people, Seibel, Helen and a tall slender man leave Unit Number 6. Helen walked in an unsteady manner. He could not identify the defendant as being one of the three persons. Later, in about two or three hours after the three people had left, they all returned. It was still daylight. One of the men was carrying a large sack and the other was helping Helen. Mr. Huntington said that Helen appeared to be crippled. This was about 8 p. m. Huntington went into an adjoining room and pretended to be making it up. He heard a crying or moaning noise coming from Unit Number 6. After dark, sometime about 10 or 10:30 p. m. he saw two men at a sports car in front of the motel. He could not identify the defendant as being the tall slender man.

Donald Whitehead, a Pomona police officer stated that he was present on May 24 at an interrogation of the defendant at the Pomona Police Department. Further, he said that the defendant had said that he was not at the Artesia Street address on May 23 and then later had admitted that he was present at such address. He also testified that he had taken notes of the talk with the defendant and had such notes with him in court but nowhere in the notes was there any notation that the defendant had denied being at the Artesia address.

Alfred Bolsta, a police officer of Ontario, was present at the questioning of the defendant on May 24. He testified that the defendant had said that he had never treated Helen before the 23d of May and that he had been called to the motel by Seibel and had diagnosed her case as an asthmatic attack and had given her oxygen in his office; that the defendant had denied performing an abortion on Helen, that he had seen Helen at the Artesia address relative to an asthmatic condition. His notes showed that the defendant admitted seeing Helen at the Artesia address.

David May, a special agent for the State Board of Medical Examiners, was present at the questioning of the defendant in Pomona on the 24th. He testified that the defendant denied

ever having been at the Artesia address and denied ever having gone there to perform an abortion. He further testified that the defendant later admitted that he had gone to the Artesia address. There was nothing in the agent's notes pertaining to defendant's being asked whether he had been to the Artesia address and to his denying having been there.

The police found a card in Helen's handbag bearing the defendant's name and address.

The defendant testified in his own defense that he was a chiropractor in private practice since 1950, was married and had three children. He had met Seibel about two years before when Seibel was showing homes for sale. Early in May, 1958, the defendant came into contact with Seibel relative to securing a second mortgage loan in response to an advertisement in the newspaper. The defendant had first met Helen in about December of 1957, when she was a member of a bowling team sponsored by a restaurant in which he, the defendant, had an interest. In March, Helen had called the defendant at his office and inquired if he had facilities to run a pregnancy test. He told Helen that he would have a laboratory make a test if she desired such. Helen brought a urine sample to the defendant and it was tested by a laboratory and found to be positive. She gave her check for $10 to the defendant for such test. The defendant paid the laboratory $10 with his own check. The defendant stated that Helen appeared to be upset about being pregnant and stated that she had hoped that she would miscarry and that she had miscarried previously. Up until the time of notifying Helen that the test was positive, the defendant had not heard the name of Seibel in connection with Helen.

About six weeks after this, Helen went to the defendant's office and talked about her eldest daughter's asthmatic condition and inquired whether a chiropractor could be of any assistance, and the defendant told her that he could make no recommendation until he had completely examined the daughter. No mention was made of Helen's pregnancy.

The defendant further testified that on May 19, Seibel called him relative to a loan and arrangements were made to meet at a restaurant that evening. The meeting was had and no reference was made to the elimination of a problem or to chemicals or anything of that nature. On May 21, Seibel called again and another meeting at a restaurant was arranged for that evening. Seibel and the defendant met at the restaurant and they talked about a loan which might be secured

through a named loan company. On May 22, the defendant went fishing and on his return home found a message from Seibel to the effect that a loan could be made. The next day, May 23, the defendant went to his office at about 10 a. m. and stayed there until about 12:15 noontime. He stated that he did not talk with Seibel in the morning of the 23d and did not make an appointment to meet Seibel at the West Artesia address. The defendant left his office with Glenn Cole to go to lunch at a café with Cole and Dr. and Mrs. Lindsay. He stayed at the café until about 1:40 p. m. and left at that time with Dr. and Mrs. Lindsay. He arrived back at his office about 1:45 p. m. and at that time Seibel called on the telephone and requested that he make a house call for Helen at her mother's residence. Seibel said she had a chest condition and he would prefer not to bring her out. The defendant arrived at the Artesia address about 1:50 p. m. and found Helen and Seibel in the front room. Helen was dressed and the defendant questioned her regarding her health, took her temperature, checked her throat and chest and took her blood pressure. Seibel did not leave the house while the defendant was there.

The defendant found upper respiratory congestion and coughing and prescribed some nonprescriptive drugs. He also left some instructions for Helen which contemplated the taking of some cough syrup and some antihistamine which another doctor had prescribed for her hayfever and some nosedrops. He was at the house not to exceed 10 minutes. Nothing was mentioned about any pregnancy. The defendant left about 2 p. m. and got back to his office within a few minutes and stayed there until about 4 p. m. when he went home.

He returned to his office about 6:30 p. m. and treated some patients until about 8 p. m. At about 8:15 p. m. Seibel called and said Helen was better in the afternoon but seemed worse that evening and wanted him to come to the Huntington Motel. After treating some patients the defendant left his office and arrived at the motel at about 9 p. m. It was dark and the defendant had to use his lights to examine the numbers in the street. The defendant entered Unit Number 6 and found that Helen was having trouble in breathing. He suggested that she required some extra oxygen and indicated that they would go to Dr. Lindsay's office in Ontario (the defendant had access to that office) which was closer than the defendant's office. Seibel, Helen and the defendant left the motel together in Seibel's automobile and ultimately arrived at the defendant's office about 9:30 p. m. where she was given three

intermittent oxygen treatments of about five to seven minutes each. Helen responded nicely. Seibel was present in the office. At no time was money discussed nor did Seibel give the defendant a check in the sum of $125. They returned to the motel about 10 or 10:15 p. m. Helen was in good condition except for exhaustion and fatigue, when the defendant left the motel at about 10:20 p. m. As the defendant walked from Unit Number 6 to his car Seibel asked what he should do if Helen got another attack and the defendant told him to call the resuscitator squad or an ambulance and defendant gave Seibel the names of three different hospitals where she could be taken. At about 12:45 a. m. May 24, Seibel called the defendant and said Helen was spitting up blood. The defendant suggested to Seibel that he call an ambulance and take her to a hospital. The defendant went to the motel but Helen and Seibel had left and defendant returned to his home.

After the arrest of the defendant he admitted having been at the Artesia address but denied that he had been there to commit an abortion. He denied having received any money from Helen, excepting the $10 check for the laboratory test and denied aborting or attempting to abort Helen.

Dr. Cavanaugh, an osteopathic physician; Dr. Lindsay and Mrs. Lindsay and Glenn Cole were each called as witnesses and each substantially corroborated the defendant's testimony insofar as each of them was concerned.

Ruby Waterman testified that she was a nurse at the Ontario Hospital in the early morning of May 24 and saw the body of Helen, and Seibel said to her as he placed his hands upon Helen's body, "My God, I've killed her."

There was evidence that Seibel had received considerable medical training while he was in the Medical Corps of the Army from 1942 to 1945.

The appellant contends: that the evidence was insufficient to support the judgment of conviction in that the corpus delicti of abortion was not established, the testimony of the accomplice Seibel was, as a matter of law, so inherently improbable as to show complete fabrication, there was no evidence connecting the defendant with the purported crime, if committed, and to corroborate the testimony of the accomplice. Also, that the court erred in permitting the accomplice to testify to hearsay statements made by the deceased victim and that the court erred in permitting the witness, Mr. Huntington, to be recalled on rebuttal by the prosecution.

We are of the belief that the corpus delicti was

established. ██ "The uncorroborated testimony of the accomplice[s] was sufficient to establish the corpus delicti." (*People* v. *Lyons,* 50 Cal.2d 245, 272 [324 P.2d 556].) ██ And, as said in *People* v. *Simpson,* 43 Cal.2d 553, 563 [275 P.2d 31] : "Proof of the elements of the crime, as contrasted with proof of the connection of defendant with the commission thereof, may rest upon the uncorroborated testimony of an accomplice." (Citing cases.) ██ The evidence shows that Helen was pregnant and that appellant knew of such condition. Her death was caused by acute pulmonary edema due to an irritated intrauterine pregnancy. The pathologist stated that it was his opinion that the irritation was inflicted upon the uterus between 6 and 24 hours before death and was most likely of a chemical nature. When the intern palpated the body a gush of serous fluid resulted which is consistent with the hypothesis of a chemical irritant. Coupled with the inconsistent statements, the testimony of Seibel, the admissions and other factors, we are convinced that an inference can be drawn to the effect that the crime of abortion was committed; even though it is not a robust showing and when viewed through appellant's interpretation it is as compatible with innocence as with guilt.

██ ██ Answering the contention of the appellant with reference to the inherent improbability of the testimony of Seibel, suffice to say that "the rule is well settled that to warrant the rejection of the statements given by a witness who has been believed by a jury, or trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions—and it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People* v. *Simpson, supra,* 43 Cal.2d 553, 562.) ██ True it is that the facts in this case as testified to by Seibel disclose some most unusual circumstances, and anyone with even the slightest knowledge as to the ordinary abortionist's methods and manner of doing business could well have doubted whether Seibel was telling the truth; nevertheless we cannot say that it was an impossibility for such things to have occurred. (*People* v. *White,* 43 Cal.2d 740, 747-748 [278 P.2d 9].) Nor can we say, as a matter of law, that the fact that Seibel was charged with murder in the first instance and was given immunity by the court made any difference in his testimony. Nor can we say that the fact that responsible

witnesses who were unimpeached testified to matters which were inconsistent with Seibel's testimony makes any difference whatsoever.

Appellant next asserts that the testimony of Seibel was not sufficiently corroborated. This court set forth in *People* v. *Spivak,* 166 Cal.App.2d 796, 808-810 [334 P.2d 44], the following which is appropriate:

"In *People* v. *MacEwing,* 45 Cal.2d 218, at page 225 [288 P.2d 257], it was said:

" 'The decisions applying section 1111, relating to accomplices, hold that the corroborative evidence required by that provision must be considered without the aid of the testimony which is to be corroborated and that it is not sufficient if it requires the interpretation and direction of such testimony in order to give it value. (Citing cases.) There are two opinions which, although not clear, indicate that a similar rule applies with respect to section 1108. (See *People* v. *Crain,* 102 Cal.App.2d 566, 579 [228 P.2d 307]; *People* v. *Murphy,* 60 Cal.App.2d 762, 772 [141 P.2d 755].) In our opinion both statutes must be construed to mean that corroboration is not adequate if it requires aid from the testimony of the person to be corroborated in order to connect the defendant with the commission of the offense charged. The instruction is therefore erroneous.'

"And in *People* v. *Brown,* 49 Cal.2d 577, at page 584 [320 P.2d 5], it is set forth:

" 'The People rely also upon the testimony of Dr. Randall, who treated Clara on January 30, 1956, as corroboration. The doctor's testimony does not meet the test of connecting defendant with the abortion which Clara underwent. *People* v. *Ramsey* (1948), 83 Cal.App.2d 707, 713, 717 [4] [189 P.2d 802], is inconsistent with *People* v. *MacEwing* (1955), *supra,* 45 Cal.2d 218, 255 [7], insofar as it suggests that testimony which does not itself connect the defendant with the criminal abortion is sufficient corroboration; in this respect the Ramsey case does not represent the law and, to avoid possible confusion, is to that extent disapproved.'

"In *People* v. *Santo,* 43 Cal.2d 319 [273 P.2d 249], the court said (at p. 327):

" 'The accomplice need not be corroborated as to every fact to which he testifies. The evidence which corroborates the accomplice need not be direct; it may be circumstantial. Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if

it tends in some degree to implicate the defendant. (Citing cases.) ▮ To be sufficient the implicating evidence "must relate to some act or fact which is an element of the offense." (*People* v. *Gallardo* (1953), 41 Cal.2d 57, 63 [257 P.2d 29].)'

"In *People* v. *Lyons*, 50 Cal.2d 245 [324 P.2d 556], the court said (at p. 257):

" 'The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged. [Citing cases.] '

▮ "The evidence required by the section in question may be sufficient, even though slight and entitled to but little consideration when standing alone. (*People* v. *Wayne*, 41 Cal.2d 814, 822 [264 P.2d 547]; *People* v. *Walker*, 88 Cal. App.2d 265 [198 P.2d 534].)

▮ "In *People* v. *Perry*, 123 Cal.App.2d 74, the court said, at page 80 [266 P.2d 515]: 'Therefore, unless we can say that the corroborating evidence is either incompetent or is of such character that it could not tend to connect appellant with the commission of the crime and could not reasonably support an inference of such connection, the finding of the jury on that issue cannot be disturbed on appeal. (*People* v. *McNamara*, 103 Cal.App.2d 729, 738 [230 P.2d 411].)'

▮ " 'The entire conduct of the parties, their relationship, acts and conduct during and after the crime, may be taken into consideration by the jury in determining the sufficiency of the corroboration.' (*People* v. *Griffin*, 98 Cal. App.2d 1, 25 [219 P.2d 519].)"

▮ Applying the rules thus set forth it is our opinion that the accomplice, Seibel, was sufficiently corroborated.

▮ Defendant asserts that it was error to permit the hearsay testimony of Seibel as follows: "She told me she was pregnant; she said, 'we are going to have to do something'; she said, 'I don't know but we have got a problem and I will see you again,' " in referring to money he had withdrawn from the bank and which he had given to Helen he testified, "She

said she was going to give it to the doctor,'' in response to the district attorney's question about the giving of money to the doctor he testified that Helen had told him ''he wanted $350 to eliminate her problem,'' the ''he'' referring to the doctor. There was also the testimony of Seibel that ''she said she had an appointment to see the doctor,'' in a few days and ''she said she was going to give him $125.00'' and ''she was to receive her first treatment'' and ''she said she would see me after the treatment.'' Further, Seibel testified, ''She said, 'I am going to have to see the doctor again, the first pack didn't work' '' and ''Helen said, 'I am getting desperate. Something has to be done, and I mean now.' She said something had to be done now 'I've got to see the doctor again.' She said, 'He is going to have to do something different, more than he has done in the past. Those other two treatments, I just don't understand them.' She said, 'It doesn't seem logical to me.' '' All of the listed conversations were held out of the presence of the appellant. The court permitted the statements under the holding of *People* v. *Wright*, 167 Cal. 1 [138 P. 349]. In the Wright case, the defendant was charged with murder causing the death of the victim by means of a criminal abortion. The deceased person had informed her sister-in-law that she was pregnant, that she did not want any more children and that she was going to a doctor to have him get rid of the child she was then carrying. Objection was made to the introduction in evidence of the declarations of the deceased as to her condition of pregnancy and the purpose of the visit to the doctor. The court said among other things at page 8 :

''Complaint is made of the introduction in evidence of the declarations of the woman as to her condition of pregnancy and the purpose of her visit to the doctor. Such declarations are hearsay. They are not admitted, *and it would be improper to admit them*, as direct proof of the commission of the abortion. They were not so admitted. They were properly admitted as evidence establishing the condition of the woman and the avowed purpose of her visit.'' (Emphasis added.) (See article in 19 Cal.L.Rev. 1, *Admissibility in California of Declarations of Physical or Mental Condition.*)

Appellant insists that the rule should be different where ''the witness whose testimony was sought to be elicited was an accomplice as a matter of law; one who had been granted an immunity so that his testimony could never be used against him.'' Suffice to say that two of the cases cited by the Supreme Court in its opinion as authority for the decision,

namely *Solander* v. *People*, 2 Colo. 48 and *State* v. *Howard*, 32 Vt. 380 [78 Am. Dec. 609], were cases involving accomplice testimony.

Appellant asserts that if the prosecutor was entitled to secure the admission of the statements (made by Helen to Seibel) into evidence at all it was for the limited purpose of establishing the pregnant condition and to establish the avowed purpose of the visit to the doctor. As set forth in the Wright case, it would be improper to admit them as direct proof of the commission of the abortion.

We think that the record in this case discloses that the prosecutor knew that many of the statements so introduced were not to prove the purpose of the visit to the doctor. It is apparent that the prosecutor made the representation to the court that the conversations or statements were admissible under the Wright case rule and presumably he led the judge to believe that the statements would be received for the limited purpose permitted under the law of the case. A jury of laymen would find it particularly difficult to segregate the testimony and to use part of it for one purpose and part of it for another purpose. It appears to us that the prosecutor in this particular case had in mind deliberately, not only to circumvent the law with reference to restricting the testimony to matters heretofore indicated, but to get before the jury other alleged criminal acts. Our thoughts in this matter are strengthened by the prosecutor's final argument wherein he said among other things:

" 'So in this case we have not one abortion, but we have three abortions. I say we have three abortions if you believe the testimony of MR. SEIBEL, and I believe if you examine MR. SEIBEL and consider the nature of his testimony, that that is what you would have to conclude, three abortions: The abortion when HELEN MCKAY first went to the defendant and had some sort of pack given her which later she told MR. SEIBEL had not worked was the first one. The second one, when again she went to the defendant, secured some sort of pack, and again it did not work, and then she told MR. SEIBEL that some more drastic method would have to be used to secure the miscarriage. Three different abortions.

" 'We have only alleged one abortion. It is quite obvious why we have only alleged the one. As to the two prior abortions there is no evidence whatsoever as to the time, place, location as to when the pack was given. From all of the testimony you have to conclude that there is no question but that the de-

*fendant did give her some sort of vaginal pack, some sort of medicine, some sort of chemical, something to procure a miscarriage, two times before the third occasion.' "*

The attorney general suggests that counsel for the appellant should have objected to the argument and then requested that the jury be admonished to pay no attention to what had been said. First of all the prosecutor must have known that he was striking a foul blow when he made the argument he did make and secondly, realism dictates that for the appellant, under the circumstances, to have called further attention to the matter by objecting and seeking comments of the judge thereon might well have indelibly branded the incorrect statements into the minds of the jury, if such were not already the case.

The effect of the testimony and the argument on the jury is apparent. This case is a very close one. The appellant could well have been acquitted and any prejudicial error should be carefully considered. The jury deliberated for four and a half days before rendering its verdict and during that time had much of the testimony read back to it.

 Appellant's last contention is that the court erred in allowing Mr. Huntington to be recalled on rebuttal by the prosecution. The district attorney called Huntington as a witness for the prosecution. Huntington stated that he was the owner of the motel, that he arrived home about 5 p. m. on May 23, 1958, and that when he first arrived he noticed two men and one woman in Unit Number 6. These men, one of whom he identified as being Mr. Seibel, helped Helen into a car shortly after 5 p. m. He could not identify the defendant as being the second man. He saw these people return about two or three hours after they left and it was still daylight and Helen was having a hard time walking. This was about 8 p. m. He then heard a crying or moaning noise emanating from Unit Number 6 and looked under the blind into the room and saw a man reading a newspaper and a woman lying on the bed. Sometime later he saw a sports car in front of the motel with Seibel and another man talking beside it. This was about 10 or 10:30 p. m.

On cross-examination the witness reiterated that these men were first noticed by him about 5 p. m. and that they returned about 8 p. m. and that it was still daylight. It was stipulated that the sun set at 7:51 p. m. on May 23, 1958. It is clear, therefore, from the testimony of Huntington that there were two men at the motel at about 5 p. m. and that they left with Helen and returned about 8 p. m. and that it was daylight

when they left and when they returned and that Helen appeared to be in need of assistance to go into Unit Number 6. Bearing in mind that Seibel and the defendant each testified that the defendant was not called and did not arrive at the motel until after dark, about 8:30 or 8:45 p. m., and that the defendant left about 10 or 10:30 p. m., the evidence is unquestioned that there was an earlier visitor, that Helen left with that visitor and the accomplice Seibel and returned in the condition described, namely worse than when she left.

At the conclusion of the prosecution's case the appellant made a motion for an advised verdict urging, among other things, that the testimony of Huntington showed that the defendant was not present at the earlier occasions. At the conclusion of the appellant's case, during which no evidence was introduced relative to Huntington's testimony as to an earlier visitor, the prosecution sought to recall Huntington to go over the same material he had testified to in the case in chief. Proper objections were made. The district attorney stated that an "improper inference" might be left with the jury if he were not permitted to recall the witness. It must be remembered that if there was any inference to be drawn from the testimony, it was from the prosecution's own witness and from questions which were put to him by the prosecution. The record discloses that under the peculiar circumstances of this case the confusion which resulted from the questions and answers thereafter put to Huntington might well have taken from the appellant a favorable inference. (See *People* v. *Carter,* 48 Cal.2d 737 [312 P.2d 665] ; *People* v. *Newton,* 139 Cal.App.2d 289 [293 P.2d 476].)

A complete reading of the entire record in this case and a thorough consideration thereof leads us to the conclusion that the appellant did not receive a fair trial and that the errors heretofore mentioned in this case were prejudicial.

The judgment and the order appealed from are and each is reversed.

Lillie, J., and Shea, J. pro tem.,* concurred.

A petition for a rehearing was denied December 16, 1959, and respondent's petition for a hearing by the Supreme Court was denied January 20, 1960.

---

*Assigned by Chairman of Judicial Council.