[Crim. No. 3332.    Third Dist.    Jan. 14, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. HAROLD PEARL et al., Defendants and Appellants.

Rudolf Binsch and Richard A. Case, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk, Attorney General, Raymond M. Momboisse and Richard Lee, Deputy Attorneys General, for Plaintiff and Respondent.

SCHOTTKY, J.—Defendants, Harold Pearl and Robert Kennedy, appeal from judgments of conviction entered after a jury found them guilty of the crimes of abortion and murder of the second degree.

Upon Pearl's request for counsel this court appointed Rudolf H. Binsch, Esq., to represent him on this appeal. Mr. Binsch has advised the court that he finds no valid grounds for an appeal and no brief has been filed on behalf of appellant Pearl, but a brief has been filed by the attorney for appellant Kennedy which to some extent applies also to the appeal of Pearl.

Kennedy makes a number of major contentions in arguing for a reversal of the judgment, but before discussing them we shall give a brief summary of the evidence as shown by the record.

Edward James McEwen testified that sometime in April 1961 Martha M. had reason to believe that she was pregnant. After the problem was discussed with McEwen, the person with whom she had been intimate, it was agreed that they should locate someone to abort her. McEwen contacted a former friend, Sandra Smart. She told him to look up Kennedy who worked in the evening at the city parking lot at 11th and "I" Streets. That evening McEwen located Kennedy and explained the situation to him. Kennedy stated he knew of a person who could help them and told McEwen to come back the following evening. After four or five visits to the parking lot to see Kennedy he was introduced to Pearl as the person who could help. There ensued a conversation as to the length of time of pregnancy, the amount of money for the "operation," and the suggestion that Martha have a laboratory test to determine whether in fact she was pregnant. Although the laboratory test was negative, deceased and McEwen were convinced that she was pregnant so McEwen went back to Kennedy who said that he would contact Pearl and see if he could make the necessary arrangements. McEwen made several other visits to Kennedy during which they dis-

cussed the fact that McEwen did not have the money for the "operation," and while McEwen was there Kennedy made several telephone calls in which McEwen heard him ask for Harry, the name by which Pearl was known.

In the latter part of May, while McEwen was at the parking lot, he again had the opportunity of talking with Pearl. At this time Pearl told McEwen to bring the money and Martha and meet him at a specified location. Upon meeting Pearl, McEwen gave him $142 and followed him to his apartment located on "O" Street.

Pearl proceeded to remove two instruments (one was plastic and resembled a knitting needle, the other was a metal object six to eight inches long) from the refrigerator and to place them in a pan of water which he heated on a hot plate. There was a disagreement between McEwen and Pearl and McEwen was told to wait in the bathroom. He looked out once and saw Martha lying on the bed but did not see Pearl do anything to her. Upon leaving McEwen gave Pearl his wrist watch as security for the money still due.

Because the first attempt was not successful another meeting was arranged. Again the same procedure was followed. (Instruments were removed from the refrigerator and McEwen waited in the bathroom.)

Subsequent contacts were made with Kennedy when the second attempt failed. Kennedy made an appointment for Martha to see Pearl on a Friday. This appointment was not kept, so through Kennedy another appointment was made for Monday, July 18, 1961. McEwen was in the hospital at this time so Martha went to Pearl's apartment alone.

There were other witnesses who testified that Martha was in good health; that she went to work in the morning, had lunch with several friends and left them at approximately 12:20 to 12:25 p.m., stating that she had a doctor's appointment at 1 p.m. At 1:09 p.m. an ambulance service received a call to go to an address, that of Pearl's. There the ambulance driver found deceased on the bed in an unconscious state. She was rushed to the emergency hospital where immediate surgery was performed to determine the cause of the internal bleeding and correct it. Martha died before a full determination of the cause of the bleeding was made.

Martha's automobile was found parked approximately 135 feet from Pearl's apartment. The keys to the automobile were found in the back of the ashtray, which was a place where they were often put by Martha. There was nothing

in the automobile which could have been used to commit an abortion. Martha's purse was found in Pearl's apartment. There were no longer slender objects in the purse.

The same afternoon of Martha's death, at approximately 2:30 p.m., the then wife of Kennedy, Elizabeth Kennedy (Papini) received a telephone call from Pearl. First Pearl talked with her, then with her husband. She overheard her husband say, "In the ambulance?" and "What happened?" and "I told you to don't use a catheter on her." After the telephone call Elizabeth Kennedy took Kennedy to downtown Sacramento.

Still later that afternoon, around 6 p.m., Kennedy's wife drove to the Sacramento Road Camp and picked up Pearl. Pearl requested that she transport him to the coroner's office so that he could see about a "dead girl." En route they stopped at the Southgate Shopping Center where Pearl made two telephone calls. After making these calls he told Mrs. Kennedy that he was more concerned about his girl friend Lydia becoming involved than he was about himself and that he would prefer "to take the rap" for her. Pearl also told Mrs. Kennedy that he was trying to call his brother to find out if his brother had gotten the catheter and wrist watch out of his apartment.

Mrs. Kennedy was directed to drive Pearl to the vicinity of his apartment, driving by instruction down the alley rather than in front of the apartment building. Pearl went into the apartment and soon returned. He told Mrs. Kennedy that his brother had taken everything out and that the "apartment was okay." Bill Pearl had in fact been to Harold Pearl's apartment during that afternoon. Bill Pearl had borrowed the apartment key from the apartment manager, gone to the apartment, and returned the key some minutes later. From the apartment Pearl and Mrs. Kennedy drove to the city parking lot where Kennedy was working. Kennedy was nervous. Kennedy and Pearl had a conversation which was overheard by Mrs. Kennedy. At one point Kennedy told Pearl, "Stick to your story. You are a Sheriff, no one is going to take some nut in the hospital's word against yours." Kennedy also advised Pearl to "dummy up, just stick to your story, they don't have no proof."

While Kennedy and Mrs. Kennedy remained at the parking lot, Pearl left in a taxi, and he was gone for 45 minutes. On his return Pearl told Kennedy that the coroner and the sheriff

were not satisfied with the story. To this Kennedy replied, "Just stick to your story, no one is going to dispute it because they don't have no evidence."

Late that same night, at about 1:15 a.m. Wednesday morning, Mrs. Kennedy answered a telephone call from Pearl. She heard Kennedy tell Pearl, "Stick to your story and no one can bother you. You are a Sheriff. They are going to take your word against some nut."

In the meantime, McEwen had become quite concerned because Martha had not returned to see him. He telephoned Kennedy shortly after 6 p.m. and asked Martha's whereabouts. Kennedy requested that McEwen telephone him back at another number. On this telephone McEwen again asked for Martha. Kennedy immediately launched into a "dissertation" to the effect that it was all McEwen's fault; that McEwen had pressured them into it; that Martha was in the hospital; and that they had done all they could. Kennedy asked if anyone had been up to see McEwen. McEwen said, "No." Kennedy then told McEwen that it was all his fault; he advised McEwen to "dumb up."

Neither Pearl nor Kennedy took the stand to testify. Other evidence will be referred to in the course of this opinion.

The first contention of Kennedy is "THAT THE VERDICT IS CONTRARY TO THE EVIDENCE THAT THE DEATH WAS CAUSED BY CRIMINAL AGENCY AND MORE PARTICULARLY MR. ROBERT KENNEDY."

There is no substantial merit to this contention. Dr. Kellog, a surgeon and gynecologist who performed the emergency surgery on Martha, testified that Martha was pregnant; that they found a jagged rent a little less than an inch in length in the cul-de-sac medial to the left sacrouterine ligament and another rent in the vaginal wall, which, in his opinion, was the obvious result of an attempt to induce an abortion and also the cause of the internal bleeding which was the cause of death.

Moreover, the evidence introduced does not support the theory of defendants during trial that these rents were a result of Martha's self-attempt to abort herself. Martha was last seen walking toward her car at approximately 12:30 to 12:35 p.m. It takes 15½ minutes to drive from the parking lot to the location where Martha's car was located near Pearl's apartment. Dr. Kellog testified that the injuries were inflicted sometime after 12:30 p.m. The call was received by the ambulance company at 1:09 p.m. No object was found

either in Martha's purse or car that could be used to inflict such injuries.

We believe that from the above evidence the jury could reasonably infer that the death of Martha was caused by criminal means employed by a person other than herself. The corpus delicti of death by the crime of murder and the crime of abortion was sufficiently established. The corpus delicti may be established upon the uncorroborated testimony of an accomplice alone. (*People* v. *Todd,* 175 Cal.App.2d 508, 521 [346 P.2d 529]; *People* v. *Odmann,* 160 Cal.App.2d 693, 698 [325 P.2d 495]; *People* v. *Simpson,* 43 Cal.2d 553, 563 [275 P.2d 31].)

Kennedy next contends that at best the evidence only shows that Kennedy had certain conversations with McEwen; that he then went on vacation; and that there is no connection shown between whatever acts were committed by Pearl and any aid, abetting or encouragement from Kennedy. Consequently, Kennedy argues there was insufficient evidence to establish that he was an aider and abettor or even an accomplice of Pearl.

Penal Code section 31 defines principals to include all persons concerned in the commission of a crime who "aid and abet in its commission, or, not being present, have advised and encouraged its commission. . . ." Presence is not necessary to aid and abet. (*People* v. *Beaulieu,* 144 Cal.App.2d 536, 540 [301 P.2d 304]; *People* v. *Beltran,* 94 Cal.App.2d 197 [210 P.2d 238].) What must be shown are facts and circumstances tending to show that the accused aided by acts or encouraged by words or gestures the person who actually committed the unlawful act. ". . . Not only must he aid such direct perpetrator by assisting or supplementing his efforts, but he must, with knowledge of the wrongful purpose of the perpetrator, abet such person by inciting or encouraging him to commit a crime. [Citations.]" (*People* v. *Carlson,* 177 Cal.App.2d 201, 205 [2 Cal.Rptr. 117].) And the person who aids and abets is liable for all the natural and probable consequences incident to the commission of the act which he counseled or advised. (*People* v. *Beltran, supra,* at pp. 205-206.)

Applying these principles to the evidence contained in the instant record, there is little doubt but that Robert Kennedy aided and abetted the commission by Pearl of the crimes of murder and abortion. Contrary to any contention by Kennedy the evidence demonstrates a long-standing conspiracy

between Kennedy and Pearl, in which conspiracy Kennedy acted as the contact man, the procurer, and Pearl actually performed the abortions. Both Sandra Smart and Keith Carroll testified that Kennedy had suggested and urged that they send to him pregnant women desirous of having abortions performed. Kennedy boasted to Miss Smart and to McEwen that he and Pearl had performed other abortions. Pearl admitted that he split the abortion moneys with Kennedy. And Kennedy himself recognized his own complicity, once the victim had died, when he told McEwen that "they" had done all they could and that McEwen should "dumb up."

Kennedy contends further that there was no evidence corroborative of the testimony of the accomplice McEwen which would connect Kennedy with the crimes charged. Consequently, Kennedy contends the conditions of section 1111 of the Penal Code have not been met.

The tests to be applied to determine the sufficiency of testimony corroborative of an accomplice have been set forth in detail by this court in *People* v. *Griffin,* 98 Cal. App.2d 1 [219 P.2d 519], at page 24, as follows:

"It is not necessary that the corroborative evidence prove independently either that the defendant is guilty of the offense or that he is guilty beyond a reasonable doubt. [Citations.] If this were not true and if it were required that a complete case for the prosecution be established without reference to the testimony of the accomplice, there would then be no occasion to offer the accomplice as a witness.

"Sufficient corroboration may be furnished by the defendant's own testimony [citations], or by admissions or confessions made by him [citations], or by silence in the face of an accusatory statement [citation].

"The entire conduct of the parties, their relationship, acts, and conduct during and after the crime, may be taken into consideration by the jury in determining the sufficiency of the corroboration. [Citations.]

"If the corroboration is inculpatory it is not essential that it extend to all of the elements of the offense, nor to every fact and detail included in the testimony of the accomplices. [Citations.]

"Conversely, such evidence is sufficient if it tends in some slight degree, at least, to implicate the defendant. It need not be strong. [Citations.]

"The testimony of an accomplice need not be corroborated by direct evidence, or, stated in another way: Cir-

cumstantial evidence suffices for the purpose of corroboration. [Citations.]

"It is sufficient, even though circumstantial and slight, if the connection of the defendant with the alleged crime may be reasonably inferred from the corroborative evidence. [Citations.]

"The corroborating evidence is sufficient if it connects the defendant with the commission of the crime in such a way as reasonably to satisfy the fact-finding body that the accomplice is telling the truth. . . .

" .  .  .  .  .  .  .  .  .  .  .  .  .

"The weight to be given to the testimony of an accomplice as well as the sufficiency and weight of the corroboration is for the jury's determination. [Citations.]

Before a verdict of a jury can be set aside upon appeal upon the ground of insufficiency of the evidence to support it, it must be made clearly to appear that upon no hypothesis whatever is there substantial evidence sufficient to support the conclusion of the trial court. [Citations.]" (To the same effect see *People* v. *Henderson*, 34 Cal.2d 340 [209 P.2d 785]; *People* v. *Trujillo*, 32 Cal.2d 105 [194 P.2d 681]; *People* v. *Wilson*, 25 Cal.2d 341 [153 P.2d 720]; *People* v. *Jehl*, 150 Cal.App.2d 665 [310 P.2d 495].)

Applying the above stated rules to the evidence hereinbefore set forth there can be little doubt that there is ample corroboration of the accomplice McEwen.

Kennedy contends also that there was error in the admission of testimony by Mr. McEwen as to a declaration of intent made by Martha to McEwen the evening before her death.

California courts have long held that declarations of intent may be properly admissible. After an elaborate review of cases, the Supreme Court summarized the conditions of admissibility as follows: ". . . Elements essential to admissibility are that the declaration must tend to prove the declarant's intention at the time it was made; it must have been made under circumstances which naturally give verity to the utterance; it must be relevant to an issue in the case." (*People* v. *Alcalde*, 24 Cal.2d 177, 187 [148 P.2d 627].) Thus in the *Alcalde* case it was held admissible to introduce a declaration of the murder victim made the evening of her demise that she intended to go out that evening with Frank (the defendant). Similarly, in *People* v. *Weatherford*, 27 Cal.2d 401 [164 P.2d 753], it was held reversible error to exclude certain statements of the decedent to the effect that

the decedent intended to take her trailer and go to the mountains. And, in *People* v. *Hawkins*, 177 Cal.App.2d 714 [2 Cal.Rptr. 524], where the same question was presented the appellate court held admissible a declaration by the deceased that she was "going to go and see Vernedia," the abortionist-murderer.

In the instant case all the conditions suggested in *Alcalde* are present. First, the declaration of Martha that she would the very next afternoon again submit to an abortion was positive evidence of her intention at the time the declaration was made. Since the declaration was made late in the evening on the day before Martha's death, it was not a declaration of an intention to commit an act in the remote future but rather a declaration to do something in the very immediate future, the very next noon. Second, her declaration to McEwen at a time when she was visiting him in his hospital room certainly was made under circumstances of complete trustworthiness. There would have been no reason to falsely declare to McEwen a matter of such mutual importance as the question of submitting to another abortion. Third, Martha's intention to again see Pearl for the purpose of submitting to an illegal abortion was highly relevant in the prosecution against Pearl and Kennedy for Martha's murder and abortion. The intention cast strong doubt on any possible suggestion that the abortion attempt was self-induced, and consequently by inference implicated Pearl and Kennedy. As such, it was highly relevant to the instant prosecution.

Kennedy's final contention is that the court erred in giving the following instruction that was restated upon request of the jury: "Now, if you find beyond a reasonable doubt that Mr. Kennedy committed any act or counsel knowingly and with criminal intent, which act or counsel aided, promoted, encouraged, or instigated the alleged abortion of July 18th, you must find him guilty of the abortion of July 18th irrespective of the date on which such act was committed."

It is Kennedy's contention that the portion of the instruction referring to his guilt of the abortion of July 18th, irrespective of the date on which such an act was committed, does not correctly express the law insofar as it relates to him for the "record is without any support that . . . [he] aided and abetted any person by act or encouragment or word or instigation or gesture or that there was any knowledge of the wrongful purpose to have some third person commit such an

act either on July 18, 1961, or any time prior thereto leading up to the alleged commission of the crime.''

This contention is devoid of merit for, as hereinbefore pointed out, the evidence amply supports the conclusion that Kennedy did aid and abet in the commission of the crime.

Because of the apparent earnestness with which counsel for Kennedy has urged his contentions for a reversal of the judgment, we have made a careful study of the entire record and are convinced that it clearly establishes the crimes of murder and abortion and leaves no doubt that Kennedy and Pearl were the perpetrators of these crimes. Bearing in mind the plain and meaningful words of section 4½ of article VI of our state Constitution, we are satisfied that even if appellant Kennedy were correct in some of his contentions of error no miscarriage of justice has resulted.

The judgments are affirmed.

Pierce, P. J., and Van Dyke, J.,* concurred.

*Retired Presiding Justice of the District Court of Appeal sitting pro tempore under assignment by the Chairman of the Judicial Council.